# IN THE SUPREME COURT OF IOWA

No. 10–0511

Filed June 8, 2012

**STATE OF IOWA,**

Appellee,

vs.

**DONALD LYLE CLARK,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Johnson County, Nancy A. Baumgartner (pretrial motion) and Douglas S. Russell (trial), Judges.

The defendant appeals his conviction for second-degree sexual abuse. **JUDGMENT OF THE DISTRICT COURT AND DECISION OF THE COURT OF APPEALS AFFIRMED.**

Clemens A. Erdahl of Nidey Wenzel Erdahl Tindal & Fisher PLC, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, Darrel L. Mullins, Assistant Attorney General, Janet M. Lyness, County Attorney, and Anne M. Lahey and Elizabeth A. Beglin, Assistant County Attorneys, for appellee.

**MANSFIELD, Justice**.

Donald Clark was convicted of sexual abuse in the second degree for molesting a fifth-grade student (C.B.) while employed as a guidance counselor at an elementary school during the 2003–2004 school year. *See* Iowa Code § 709.3(2) (2003). Clark appeals, arguing that his constitutional rights to a fair trial and due process were violated when the trial court failed to grant his request for a continuance and to allow the retaking of depositions based on the late disclosure of an e-mail written by the student. We find that the complained-of actions did not violate Clark's constitutional rights. We also find they did not amount to an abuse of discretion. Therefore, we affirm Clark's conviction and sentence.

### I. Facts and Procedural History.

During the 2003–2004 academic year, Donald Clark was a guidance counselor at an elementary school attended by C.B. C.B., a fifth-grade student, previously had been diagnosed with attention deficit disorder. When C.B. began experiencing issues regarding his concentration and academic progress, a meeting was held between his parents and school personnel. It was decided that C.B. would begin seeing Clark, the school guidance counselor.

C.B. visited with Clark about once or twice a week during the 2003–2004 academic year. Clark would come and get C.B. from his classroom, and they would go to Clark's office where they would talk and play board games for about twenty to thirty minutes. During these visits, C.B. and Clark were generally sitting on the floor of Clark's office. C.B. recalled being victimized by Clark on at least two of these occasions.

The first alleged instance of abuse occurred during the second semester, after C.B. had already visited with Clark several times.

According to C.B., he was in the process of telling Clark about an argument he had had with his older brother. Clark said he was sorry the argument had occurred and touched C.B.'s leg. According to C.B., Clark then proceeded to move his hand towards C.B.'s crotch and began feeling his genitals through his pants. When C.B. tried to protest, Clark covered C.B.'s mouth and told him not to tell anyone.

On the second occasion recalled by C.B., Clark took him into his office, turned off the lights, and held a stuffed animal over his face. C.B. stated that Clark then put his hand inside C.B.'s pants and began rubbing his genitals. According to C.B., in this instance Clark sounded aggravated, very upset, and aggressive. He told C.B. to shut up and never to tell anyone. Clark waited for C.B. to calm down and stop crying, and then let C.B. return to the classroom. This second occasion occurred at the end of the spring semester.

C.B. believed there were other times that Clark inappropriately touched him, but those two were "the only times I remember in vivid detail."

C.B.'s mother noticed her son becoming frustrated and increasingly angry during the spring semester of fifth grade. At times, he would be reserved and unwilling to open up. C.B.'s father remembered that after fifth grade, C.B.'s life "spiraled out of control." By seventh grade, C.B. was drinking, using drugs, and engaging in other self-harming behaviors such as cutting himself. C.B. also attempted to commit suicide on more than one occasion. According to C.B.'s father, C.B. tearfully told family members that "[his] life sucked" and there was one thing they didn't know, but he refused to tell them what was going on.

In the spring of 2009, C.B.'s father, a deputy sheriff who works in the Johnson County jail, encountered Clark who was serving time for an OWI. There was an incident where Clark was involved in sexual acts in the jail, and C.B.'s father raised the question to C.B. whether anything had ever happened between C.B. and Clark years before. C.B. denied that it had.

As a result of C.B.'s behavioral problems, C.B.'s parents sent him to a highly structured school for troubled youth in Keokuk, Iowa. Shortly after arriving at the school on May 15, 2009, C.B. disclosed the alleged abuse for the first time during group therapy. C.B. testified that the revelation was triggered by one of his peers talking about having molested his own brother. A few days later, on June 8, 2009, C.B. wrote his family a five-page, single-spaced e-mail in which he discussed the alleged sexual abuse but did not identify the perpetrator. The e-mail stated in part:

> [I would] rather just tell you guys in my letter the true honest to god reason [I] really started everything like my drug use and what not. [W]ell before as you guys know [I] said it was because [I] see things and that [I] never really felt loved or anything but that was only a little [] part of why I really was doing those things and acted that way. . . . [B]ack in fifth grade [I] was sexually abused and as you know [I] started doing bad things around seventh grade. [M]y whole life [I']ve been seeing things and hearing things and [I] just used that as my reason . . . . My whole life [I ha]ve been living a lie from you guys. [I] remember you guys always suspected som[e]thing happening like me being sexually abused especially when me and [my brother] were going through the lessons at the church downtown for our com[m]union and what not and you guys asked me if the priest ever did anything to me or [my brother] well that was true he didn[']t do it to me it was someone else. [A]nd that [is] one of the reasons [I] did[ not] want to do counseling I really was[ not] wanting to talk about it [I] just wanted to crumple it up and throw it away. [I] never wanted to go to counseling because [I] though[t] you guys would some[]how get it out of me and I was scared of what you guys might do . . . . [S]o my whole life [I ha]ve seen things and heard things

. . . [I] was sexual[l]y abused by someone in fifth grade and those are the main reasons [I] started doing drugs.  [T]hose are actually the only reasons [I] started doing drugs.  [I]t [is] still really hard for me to tell you guys this even though [I am] typing it . . .  [I] shared about this in group and it really helped[. I] got the courage because a few days ago one of the kids shared about him sexually abusing his brother.  [W]ell during that time [I] had tears coming down my face because [I] could feel what his brother is going through and [I] could relate to it.  [W]ell when that kid was sharing [I] just wanted to kill him to be honest cause of what he did.  [A]nd it also gave me the courage to tell everyone in the family what happened . . . .

. . . .

[W]ell back to the sexually abused thing.  [I]t has really made me the angry kid [I] am today.  [I] have held it in for so long and [I] have never talked to anyone about it until two or three days ago y[ou] know and like almost every night since that night [I] have cried myself to bed and remember mom when [I] would say there is something wrong with my eye when there would be a random tear drop running down my face . . . well that[ is] not true I umm would be thinking about that day when that normally happened that was just a front so you guys would[ not] know or find out.

[A]nd this is the whole reason [I ha]ve been wanting to do counseling now like [I ha]ve put it out there and [I a]m really like wanting to talk about this.  [N]ow [I] finally got the courage to put this out here and like this is why [I] really do [not] need to be here . . .  [I] want to see a counselor about this and talk to someone and shit but they w[ill no]t let me here.  [I ha]ve brought up seeing a psychiatrist or a counselor how many times to the staff to tell my rep or even see a counselor that comes to the school and every time they say they will tell my rep or the counselor and nothing happens . . . .

. . . .

[A]nother thing that has came up is [I] told my family rep Mr[.] Jordan about me seeing and hearing things[. W]ell he said he would talk to mom and dad about it because you know kids in here lie about this shit . . . [W]ell [I a]m not l[y]ing about it and [I] told him [I] want to see you guys and all go see a psychiatrist to see if [I] can get meds for this because [I a]m tired of dealing with this shit and [I] want it to go away . . . [I] really want to change and it[ i]s hard when [I a]m constantly l[y]ing to people about shit that happens and just playing it off that [I] do[ no]t have something that [I] do have and it[ i]s hard when you guys just say it[ i]s spirits and

shit when [I] really do [no]t feel that it is.  [A]ll you guys say is it[ i]s spirits and not schi[]zoph[re]nia but you guys do[no]t know and you do[ no]t want me to get tested or anything or talk to a psychiatrist about it when I want to becau[s]e [I] feel it will make a difference in my life but you guys do[ no]t want to put fo[]rth the effort or money to try somthing new.

. . . .

[I] really do[ no]t need to be here[. I a]m open [I] want to change [I] want to go to a counselor[. I] know in the past [I] did[ no]t want to but [I] explained why in the beginning part of my letter and [I] hope you guys read this and take it all in[.] [Do no]t think [I a]m just saying this or l[y]ing it[ i]s all very true.

After receiving the e-mail, C.B.'s parents contacted the school and asked that C.B. see a social worker.  C.B. spoke to two social workers and revealed that he had been sexually abused during his fifth-grade counseling sessions with Clark.  The school, as well as C.B.'s father, reported the allegations to the police who initiated an investigation.  In his written statement to the police, C.B. reiterated that he had been abused by Clark during these counseling sessions.  He added:

My parents always suspected that something like this ha[d] happened to me[.]  I remember a few years after going through my first com[m]union at my church my parents asked me and my brother if the priest that was there ever had done anything to me or my brother[.]  We both always said no because that was the truth, but I never told them about Mr. Clark.  After the incident in the Johnson County Jail with Mr. Clark, my parents asked me about him doing anything to me and I would always just say no and avoid the subject about all of it.

The statement continued:

I would always tell [my brother] my life sucked because of me hearing and seeing things . . . and he would mock me over it all but I would always tell him that there is one more thing[,] one more reason why it sucks and I never told anyone that reason until I got to [the school].  And in the letters I acquired from my parents during my stay [at the school] they said they always knew something happened to me and that they expected it was Mr. Clark.

On August 20, 2009, a trial information was filed charging Clark with second-degree sexual abuse, in violation of Iowa Code sections 709.1(3), 709.3(2), and 702.17 (2003). On August 28, 2009, an order was entered approving depositions of minuted witnesses. The order added, "The State shall disclose any exculpatory evidence, including any evidence relating to the credibility of minuted witnesses." On October 7, 2009, Clark waived his right to a speedy trial, and a jury trial was scheduled for February 8, 2010. Depositions were taken on January 20, 2010.

During the depositions, Clark's attorney asked C.B.'s parents if they still had the e-mail in which C.B.'s allegation of sexual abuse was first made known to them. C.B.'s father indicated they did. At that time, Clark's attorney inquired of the prosecutor whether she had the e-mail, and she said she did not. Clark's attorney then requested that the e-mail be furnished to both parties.

That same day, Clark's attorney questioned C.B. in his deposition regarding prior drug use and mental health. C.B. denied ever having been told he suffered from depression "until I just recently met with a psychiatrist like two, three months ago." When asked about hallucinations, C.B. said they had occurred when he was on drugs. C.B. also admitted having tried to commit suicide several times.

Some time after the depositions were completed, the parents provided a copy of the e-mail to the State. A "redacted" version was furnished to Clark's defense counsel on February 3, 2010.[1]

---

[1]What the State described as a "redacted" version of the e-mail consisted of only about one-sixth of the e-mail. The State produced only the portions where C.B. discussed being abused while in the fifth grade, leaving out essentially everything else, including passages that talked about honesty and lying, C.B.'s mental state, and C.B.'s relationship with his parents and severe dislike of the structured school.

On Thursday, February 4, 2010, Clark submitted a request for production, request for additional depositions and motion to continue.[2] In the motion, he requested an unredacted version of the e-mail, as well the reopening of depositions and a continuance. Clark explained:

> Although based on the information available to the undersigned at the time, depositions have been completed, the letter in question here raises information not previously made available to the Defendant. Proper exploration of said information is proper and necessary in connection with the Defendant's fair trial and due process rights, and this, in turn, requires that depositions be reopened as they relate to the information contained in the document.

> Because these matters have only come to the attention of the undersigned within the last 12 hours, and because trial in this cause is now set to occur in less than four days, a continuance is justified [in] order to allow proper time to review the document at issue, to prepare proper lines of inquiry, and then to depose the witnesses.

The following morning, the State resisted the request for continuance and additional depositions. The State maintained that the defendant had been aware of the existence of such a communication ever since the alleged abuse was reported to authorities in June 2009, that the e-mail did not refer to any instances of abuse other than those involving Clark, that C.B. and his parents had been thoroughly deposed and most of the relevant information in the e-mail was covered by those depositions, and that the case had already been pending for six months.

_____

The State argues that it believed at the time it would be inappropriate to produce the entire e-mail based on rule 5.412 of the Iowa Rules of Evidence. *See* Iowa R. Evid. 5.412 (limiting the admissibility of an alleged victim's past sexual behavior). However, rule 5.412 is a rule of admissibility, not discovery. *See id.* at 5.412(*a*) ("[I]n a criminal case . . . evidence of the past sexual behavior of an alleged victim of such sexual abuse is not admissible."). And in any event, most of the "redactions" did not concern C.B.'s past sexual behavior.

[2]The docket stamp indicates the motion was filed February 5, but the district court stated on the record that it had been filed on the 4th, and the certificate of service indicates it was served on the 4th.

The State also provided a full version of the e-mail under seal to the district court.

The court held a hearing at 11:48 a.m. on February 5. Before the commencement of the hearing, the State provided the complete unredacted e-mail to Clark's counsel. After briefly hearing from counsel, the district court took the matter under advisement. At 1:23 p.m., after reviewing the e-mail and the previous depositions, the district court issued a ruling. The court ordered that the entire e-mail should be produced to the defense. However, it denied Clark's other requests. The district court stated there was "nothing in the email that warrant[ed] further investigation, depositions or a continuance of the trial."

Trial commenced the following Monday, February 8, 2010. Before jury selection began, Clark renewed his motion to continue.[3] The district court again denied it.

C.B. was the State's first witness. He testified in a matter-of-fact manner about the two incidents of sexual abuse that had happened six years before. Clark's defense counsel then began cross-examination by bringing up the e-mail. His theme was that C.B. was highly troubled and not a credible witness. He got C.B. to admit that he had heard things which people had not said. He suggested that when C.B. was sent to the structured school in the spring of 2009, he made up the accusation against Clark as a way to get out of the school. Clark's counsel had C.B. confirm that earlier the same spring, Clark had been a topic of conversation between C.B.'s father and C.B. regarding sexual acts at the Johnson County jail. The implication of defense counsel's questioning

---

[3]At that time, Clark's counsel said, "We want to renew that motion today. We believe that Mr. Clark's fair trial rights and opportunity to fully explore defenses warrant[] the continuance." Clark's counsel did not cite anything specific that he hoped to accomplish during the requested continuance.

was that C.B. had absorbed what he had heard from his father and then leveled a false accusation against Clark.

Next, both of C.B.'s parents testified. They stated that C.B. had problems with attention deficit disorder as a youngster, and then began having more serious behavioral problems after the fifth grade, including anger, drug and alcohol abuse, and self-destructive behavior. C.B.'s father acknowledged on cross-examination that he had brought up the subject of Clark with his family in the spring of 2009 (shortly before C.B. went to the structured school) after Clark was involved in the incident at the Johnson County jail. In the course of their testimony, C.B.'s mother denied that C.B. had ever been diagnosed with schizophrenia or that this was a concern of theirs, and C.B.'s father denied that he had ever believed or had a concern that C.B. was being abused by a priest.

An elementary school principal who had supervised Clark until 2005 also testified for the State. He recalled having a conversation when Clark first came to the school in 2001. Clark had used paper to cover the long narrow window in the door to his office. The principal told Clark that the window should not be covered, and Clark responded that the students who were seeing him wanted to have privacy and not be visible to other students passing by. A compromise was reached that the window would be covered halfway up so that adults but not children could see into the office.

A teacher at the same elementary school also testified. He recalled that Clark arrived at the school in 2001 and left in 2008. Twice, this teacher had conversations with Clark about the window to his office being completely covered and needing to be uncovered. He told Clark this was for his own protection. One of the conversations occurred shortly after Clark arrived at the school; the other years later shortly

before Clark left. This teacher remembered that for some period of time in between the window was half-covered.

An Iowa City police officer appeared as the State's final witness. He testified that as part of his investigation he interviewed Clark. When Clark was asked if an incident of touching with C.B. had occurred, Clark responded that "he did not touch *or rub* [C.B.] in any way." (emphasis added). This was surprising to the officer because he had not brought up any allegation of rubbing at that point. The officer nonetheless remembered that Clark was consistent in his denials of wrongdoing.

The officer also introduced photographs he had taken of the door to Clark's former office. He explained that it would have been difficult for anyone outside the office to see what was happening inside unless the person had his or her face up against the narrow window. He added that the office was "kind of out of the way."

Clark was the only witness called by the defense. He described his teaching career and his interactions with C.B. when C.B. was in the fifth grade. He denied ever inappropriately touching C.B. in any way. Clark also testified he was gay. He said he believed this was known to the older children at the elementary school. Clark said he covered the window of the door because it was a small room and he had been decorating the interior. When the principal raised his concern, Clark recalled that he uncovered the window completely. According to Clark, it was uncovered at the time he counseled C.B.

On February 10, 2010, the jury returned a verdict finding Clark guilty of second-degree sexual abuse. Clark moved for a new trial, arguing that he should have been granted a continuance because of the late disclosure of the e-mail. He maintained the lack of a continuance "denied Defendant his statutory and constitutional right to a fair trial."

The district court denied Clark's motion. On March 18, Clark was sentenced to an indeterminate term not to exceed twenty-five years in prison. *See* Iowa Code § 902.9(2). Clark is required to serve seventy percent of that twenty-five-year maximum. *Id.* § 902.12(3).

Clark then appealed. We transferred the case to the court of appeals.

On November 9, 2011, the court of appeals affirmed Clark's convictions and sentence. The majority on the three-judge panel found that Clark had not been denied his constitutional rights to due process or a fair trial. They agreed with the district court that there was nothing in the e-mail that "warranted further investigation, depositions or a continuance of the trial." They noted that Clark's attorney had been able to question C.B. in deposition regarding his mental health, criminal, and sexual history. The court noted that Clark did not identify what additional information could have been learned by redeposing C.B. and his parents.

One judge dissented. He urged that an "opportunity for post-disclosure depositions should have been granted to the defendant" and that the refusal to do so "denied defendant of fundamental due process and fair play."

We granted Clark's application for further review.

**II. Standard of Review.**

We generally review a district court's denial of a motion for continuance for an abuse of discretion. *State v. Artzer,* 609 N.W.2d 526, 529 (Iowa 2000). However, Clark correctly observes that when we review a claimed violation of the constitutional right to present a defense the correct standard of review is de novo. *State v. Cashen,* 789 N.W.2d 400, 405 (Iowa 2010); *State v. Lyman,* 776 N.W.2d 865, 873 (Iowa 2010). We

also review claims of ineffective assistance of counsel de novo. *Everett v. State*, 789 N.W.2d 151, 158 (Iowa 2010).

**III. Legal Analysis.**

**A. Due Process, Fair Trial, and the Right to Present a Defense.** On appeal, Clark challenges the district court's refusal to grant a continuance and to allow the retaking of depositions based upon the right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Iowa Constitution and the right to a fair trial under the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 10 of the Iowa Constitution. We have considered the federal and state constitutional provisions "as congruent" for purposes of appeal when the appellant provides no argument they should be applied differently. *See DeSimone v. State*, 803 N.W.2d 97, 103 n.3 (Iowa 2011). We will follow that approach here.

The right to present a defense stems from the Sixth Amendment right to a fair trial. *Washington v. Texas,* 388 U.S. 14, 18–19, 87 S. Ct. 1920, 1922–23, 18 L. Ed. 2d 1019, 1023 (1967). However, this court, as well as the United States Supreme Court, "has simply relied on the Due Process Clause alone when deciding issues in this area." *State v. Simpson*, 587 N.W.2d 770, 771 (Iowa 1998).

The right to present a defense is so fundamental and essential to a fair trial that it is accorded the status of an incorporated right through the Fourteenth Amendment's Due Process Clause. *Osborn v. State*, 573 N.W.2d 917, 921 (Iowa 1998). We have explained the right to present a defense as follows:

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the

defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."

*Id.* at 921 (quoting *Washington,* 388 U.S. at 19, 87 S. Ct. at 1923, 18 L. Ed. 2d at 1023).

Clark urges that the denial of his requests for new depositions and a continuance deprived him of these constitutional rights. We will address the deposition request first. The right to present a defense does not afford a criminal defendant the right to depose witnesses. A criminal defendant has no due process right to pretrial discovery. *Jones v. Iowa Dist. Ct.,* 620 N.W.2d 242, 243 (Iowa 2000) (citing *State v. Weaver,* 608 N.W.2d 797, 803 (Iowa 2000)); *accord United States v. Adcock,* 558 F.2d 397, 406 (8th Cir. 1977), (rejecting claim for broad discovery rights under the Sixth Amendment and holding that the purpose of Federal Rule of Criminal Procedure 15 is preservation of evidence not pretrial discovery). It follows, therefore, that Clark had no constitutional right to retake the depositions of C.B. and his parents.[4]

Regarding the request for a continuance, it is possible to conceive of a circumstance when a continuance might be constitutionally required. Indeed, in one case we reversed a termination of parental rights for denial of a continuance, stating, "It is clear that a defendant in

---

[4]Clark's citation to *State v. Gambell,* 262 N.W.2d 792 (Iowa 1978) is not on point. In *Gambell,* the trial court refused to allow counsel for an indigent defendant to take any depositions of the State's witnesses by stenographic means, directing instead that he take depositions by tape recording and refusing his application for a transcript of those depositions at state expense. *Gambell,* 262 N.W.2d at 794. On appeal we reversed, relying both on constitutional ineffective-assistance-of-counsel grounds and on the court's failure to follow the statute regarding pretrial depositions. *Id.* at 795. Whatever the present scope of *Gambell,* it does not speak to a situation where counsel has had the opportunity to take stenographically recorded depositions in accordance with the rules at state expense.

a criminal case who goes to trial has been denied effective assistance of counsel if counsel is not given adequate opportunity to prepare for trial." *In re Interest of Orcutt*, 173 N.W.2d 66, 69 (Iowa 1969). That case involved counsel who had been appointed just three days before the hearing and had been unable to consult with the client until the day of the hearing. *Id.* at 67–68. "Assignment of counsel under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case will not satisfy the necessary requisite of due process of law." *Id.* at 70; *see also State v. Williams*, 207 N.W.2d 98, 106 (Iowa 1973) (noting there are "constitutional bounds" to a judge's discretion to grant or deny a continuance).

Here, however, Clark's attorney obtained the entire e-mail a few days before trial. While the e-mail was undoubtedly an important document and one that the prosecution had a duty to provide to the defense, it did not dramatically change the direction of the case. Clark knew from the depositions and otherwise that his accuser had a troubled past including behavioral issues, mental health issues, and problems with substance abuse. Furthermore, Clark knew that, according to C.B., the parents had suspected a priest of having abused C.B. Clark also knew that after an incident involving Clark occurred in the Johnson County jail in the spring of 2009, C.B.'s father asked C.B. about Clark. Clark additionally knew that C.B. denied any abuse by Clark at that time, and C.B. did not make any accusation against Clark until after arriving at the highly structured school.

It is true that a reference to schizophrenia surfaced for the first time in the e-mail,[5] and that the e-mail exposed C.B.'s serious issues

---

[5]C.B. told his parents, "[A]ll you guys say is it [i]s spirits and not schi[]zoph[re]nia but guys don't know and you do[ no]t want me to get tested or anything or talk to a psychiatrist about it . . . ."

with the structured school, but Clark's counsel was able to cross-examine C.B. on those subjects at trial and use them as part of an overall theme that C.B.'s accusation lacked credibility.

Apart from the desire to retake depositions, Clark's reasons advanced below for needing a continuance were "vague and uncertain." *See State v. Melk,* 543 N.W.2d 297, 300 (Iowa Ct. App. 1995) (finding the trial court did not err in denying a continuance where defendant failed to identify specific "good and compelling cause" for continuance). Clark said only that he wanted to conduct more "investigation." Although Clark's appellate briefing cites *Cashen,* 789 N.W.2d at 408–10, which establishes a protocol for obtaining a victim's mental health records, Clark's counsel never argued below that he needed to obtain C.B.'s mental health records or made this a reason for wanting a continuance.

Clark also has made no showing that any information he would have obtained from further investigation would be material to his defense. *See Simpson,* 587 N.W.2d at 774 (defendant failed to establish due process violation where there was no showing that prospective testimony was "*clearly* exculpatory"). There has thus been no demonstration of prejudice resulting from the trial court's denial of his motion. Therefore, Clark's claim that the district court's denial of his motion for continuance and additional depositions violated his due process rights and right to present a complete defense must fail.[6]

---

[6]Citing *State v. Eads,* the dissenting judge of the court of appeals urged that "fundamental due process requires that fair play should govern the discovery practice as allowed by the Iowa Rules." 166 N.W.2d 766, 769 (Iowa 1969) (stating that "surprise and guile should, as far as possible, be removed from the arena in criminal trials just as it has in civil cases"). We do not question that general proposition, but fair play is a matter of degree. Here the e-mail was disclosed a few days before trial; defense counsel previously had most of the information set forth in the e-mail; and defense counsel was able to use the e-mail in defending the case. *Eads* involved a situation where the State intentionally withheld physical evidence and scientific reports. *Id.* at 771–72.

Clark does not specifically argue that the disclosure of the victim's e-mail on the Friday before trial constituted a *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83, 86–87, 83 S. Ct. 1194, 1196, 10 L. Ed. 2d 215, 218 (1963).[7] A majority of federal circuit courts have held that "while the untimely disclosure of *Brady* material does not constitute a constitutional violation in itself, it may violate due process if the defendant can show he was prejudiced by the delay." *United States v. Burke*, 571 F.3d 1048, 1055–56 (10th Cir. 2009) (citing cases from various federal circuits). Our cases follow a similar analytical framework. In *State v. Piper*, we considered a *Brady* claim based on late disclosure of evidence and stated that evidence is not considered suppressed in a constitutional sense " 'if the defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence.' " 663 N.W.2d 894, 905 (Iowa 2003) (quoting *Harrington v. State*, 659 N.W.2d 509, 522 (Iowa 2003)), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010). We added:

> [The defendant's] generalized assertions that the late revelations hindered the defense team's trial preparation and put a strain on the jury are insufficient to establish a reasonable probability of a different outcome. Thus, while the late disclosures disrupted the trial and were concededly a frustration to and burden on the defense, we do not think they deprived the defendant of a fair trial.

*Id.* at 905.

In sum, Clark has failed to show he was prejudiced by the denial of his request for a continuance, and the record demonstrates he was able to effectively use the e-mail at trial.

---

[7]To be clear, it is not essential to Clark's position that the e-mail be exculpatory. A continuance may be warranted in some circumstances to deal with incriminating evidence that has not been disclosed in a timely fashion, as well as exculpatory evidence.

**B. Abuse of Discretion.** Although Clark's briefing focuses on a claimed deprivation of constitutional rights, he also argues at one point that "[t]he court abused its discretion in denying the request for a continuance and for more depositions." We will therefore address this contention.[8]

Turning first to the depositions, we note that

> [d]iscovery matters are committed to the sound discretion of the trial court, and are reviewable only upon an abuse of that discretion. Error in the administration of discovery rules is not reversible absent a demonstration that the substantial rights of the defendant were prejudiced.

*State v. Gates*, 306 N.W.2d 720, 725 (Iowa 1981) (citations omitted) (finding the trial court did not abuse its discretion in scheduling defense depositions of the state's out-of-state witnesses for the afternoon following jury selection). "[A]lthough criminal defendants possess the right to depose witnesses to be called on behalf of the state, this right is subject to reasonable regulation [by the trial court]." *Id.*

Iowa Rule of Criminal Procedure 2.13 governs depositions in criminal cases. It provides that a "defendant in a criminal case may depose all witnesses listed by the state on the indictment or information or notice of additional witnesses in the same manner and with like effect and with the same limitations as in civil actions." Iowa R. Crim. P. 2.13(1). This rule "does not contemplate the use of depositions for discovery, although a deposition is commonly viewed as a discovery tool." *State v. Belken*, 633 N.W.2d 786, 795 (Iowa 2001) (citing *Osborn v.*

---

[8]Clark's appellate briefing is almost exclusively devoted to the constitutional rights of fair trial and due process. For example, at the outset of his argument, Clark states, "[T]he issues in this case rest on constitutional claims involving Clark's due process right to present a defense." Nonetheless, we will assume without deciding that Clark has also raised a nonconstitutional argument that he should have been granted redepositions and a continuance.

*Massey-Ferguson, Inc.*, 290 N.W.2d 893, 897 (Iowa 1980)). The legitimate uses of depositions in a criminal case include the preservation of testimony and the contradiction or impeachment of the deponent as a witness. *Id.*

Rule 2.13 does not delineate a right to a second deposition. *See* Iowa R. Crim. P. 2.13. While circumstances might exist where redepositions would be appropriate, *see State v. Veal*, 564 N.W.2d 797, 810–11 (Iowa 1997)*, overruled in part on other grounds by State v. Hallum*, 585 N.W.2d 249, 253–54 (Iowa 1998)*, vacated on other grounds*, 527 U.S. 1001, 119 S. Ct. 2335, 144 L. Ed. 2d 233 (1999), we find the district court did not abuse its discretion under the circumstances of the case, for the reasons we have already discussed above.

Iowa Rule of Criminal Procedure 2.9 governs a trial court's decision to grant or deny a motion for continuance. Rule 2.9(2) provides that "[t]he date assigned for trial shall be considered firm. Motions for continuance are discouraged. A motion for continuance shall not be granted except upon a showing of good and compelling cause." Iowa R. Crim. P. 2.9(2).

> The decision to grant or deny a motion for continuance rests in the sound discretion of the trial judge. It will not be disturbed on appeal unless an injustice has resulted. The standard recognizes the interest of both the state and the defendant in a speedy and fair trial.

*Artzer*, 609 N.W.2d at 530 (citing *State v. Leutfaimany*, 585 N.W.2d 200, 209 (Iowa 1998)). "[I]t is largely within the trial court's discretion to grant or refuse to grant a continuance on the ground of surprise." *State v. Johnson*, 219 N.W.2d 690, 697 (Iowa 1974).

We have already alluded to the vague nature of the defendant's arguments below for a continuance (aside from the desire to retake

depositions).[9]   Under the circumstances, we do not find an abuse of discretion.  The prosecution learned about the existence of the e-mail at the same time as Clark's defense counsel on January 20.  The State did not produce the unredacted version of the e-mail until February 5th— three days before trial.  Still, the district court, that same day, reviewed both the e-mail and the depositions previously taken and concluded, in effect, that the e-mail did not change the complexion of the case such that further investigation and preparation time was needed.  While we might not have made the same call had the decision been ours, we cannot say it was an abuse of discretion.

Clark now contends that his ability to present a complete and meaningful defense was hindered because the e-mail contained information not previously disclosed to him, including: the victim's statement that he suffered from hallucinations and his concern that he may be suffering from schizophrenia; his parents' suspicion that he was sexually abused by a local priest; his desire to leave the highly structured school his parents placed him in; and his dishonest behavior.  But none of this information should have surprised Clark.  C.B.'s statement to the police included an assertion that he was "hearing and seeing things." Clark's defense counsel questioned C.B. about that in deposition.  C.B. responded that he had experienced hallucinations while he was on drugs.  C.B. was also asked whether he thought people were out to get him, and he responded that he had those thoughts "[s]ince as long as [he] c[ould] remember."[10]   C.B. also testified he was told he had

---

[9]Even when Clark's counsel renewed the motion for continuance on Monday morning, having had the entire e-mail since Friday morning, he did not cite any new grounds for needing a continuance.

[10]As we have noted, the word "schizophrenia" did not appear during the deposition, as it did in the e-mail, but C.B. was questioned in deposition about both hallucinations and paranoia.

depression when he "just recently met with a psychiatrist" two or three months ago. These references were sufficient to alert Clark's counsel to any need to explore the possibility of mental illness in the victim.

Clark contends the victim's belief that his parents suspected a priest had sexually abused him was a surprising revelation in the unredacted e-mail. However, this assertion had been set forth in C.B.'s statement to the police, which Clark's counsel already had. Nonetheless, Clark's defense counsel declined to ask C.B. a single deposition question regarding this matter. At trial, C.B.'s father was cross-examined on the matter and testified that he never actually suspected that the priest mentioned in the e-mail was the perpetrator. Furthermore, C.B.'s interactions with the priest mentioned in the e-mail occurred some two years before C.B. came into contact with Clark. C.B.'s testimony as well as the testimony of his parents indicated that C.B. did not begin experiencing significant depression and behavioral problems until after his interactions with Clark.

In deposition, Clark's counsel also explored the highly regimented and structured nature of the school in which C.B. was placed in the spring of 2009. At that time, Clark's counsel did not inquire about C.B.'s desire to return home. However, at trial, using the e-mail, Clark's defense counsel cross-examined C.B. extensively regarding his desire to leave the highly structured school into which he had been placed.[11]

---

[11] Q: So you wrote [the e-mail] the same day that you sent it out? A: Yes.
Q: Okay. And that was three weeks after arriving at Midwest? A: Yes.
Q: How long of a program is Midwest typically for the average kid? A: It's self-pace. Everything is by your commitment scale. When you want to get out of there, you put in the work to get out.
Q: What is the average do you think? A: When I first got there, I was told, you know, within a year is when you normally leave.
Q: You didn't like being there, did you? A: No.

Clark's counsel also used C.B.'s statements in the e-mail regarding hallucinations and schizophrenia to try to undermine C.B.'s credibility.[12]

_____

[12] Q: In fact, there are some pretty scary, horrifying things going on there in those first three weeks alone, weren't there?  A: Yes.

. . . .

Q: Something about peeing in soap?  A: Yes.

Q: That people then use to wash with?  A: Yes.

Q: Something about someone masturbating into their hand and rubbing it on somebody's face?  A: Yes.

Q: There were fights?  A: Yes.

Q: There were conflicts and all kinds of situations and circumstances?  A: Yes.

Q: You didn't want to be there, did you?  A: No.

Q: And, in fact, didn't you ask in the letter that we have been talking about that you be allowed to come home and you were agreeable now to go to counseling?  A: I would agree to go to counseling, yes.

Q: Now, you talked in here in this letter also—and I want to get your thoughts now on it—you had concerns, at least in June, that you might be schizophrenic?  A: Yes.

Q: What were the symptoms that you had that made you think that?  A: It was everything, you know, dreams.  I did a lot of drugs at home.  I have talked to drug counselors that say, you know, you can have very terrible vivid dreams and they won't even go away until most likely a year after you stopped using.  I mean, it was that.  I think that someone would be talking to me, but no one would even be there.

Q: For how many years had you experienced the sense that you were hearing things when people weren't there to say them?  A: Since seventh grade.

Q: Who was it in your life that was saying that these aren't hallucinations, these are spirits?  A: My parents.

Q: What did they—What was your understanding of what they meant when they said "spirits"?  A: Something that is not there.

Q: Well, are they meaning like ghosts or demons or something like that?  A: I just took it as you know someone that you can't really see but you can just talk to.

. . . .

Q: You felt that people were out to get you?  A: Yes.

Q: And you admitted to me, at least the other day, that it turns out that's not really true, is it?  A: Yes.

. . . .

Q: And you talked about hearing things and wanting to see a psychiatrist?  A: Yes.

Q: And you talked about wanting to go to counseling?  A: Yes.

Q: And you talked about not needing to be at Midwest anymore, didn't you?

. . . .

C.B. also testified at trial regarding his father's forceful personality, consistent with C.B.'s reference in the e-mail to his father being a "bad ass mofo." As C.B. testified on cross-examination, "I was scared . . . . You know, my dad was in the military. I thought he would do something, not good [like k]ill someone [or] hurt someone." C.B.'s alleged "dishonest behavior" was also explored extensively both in deposition and at trial.

Thus, the record shows that much of the information covered by the e-mail was already in the case. It also shows that trial counsel used his weekend before trial to frame additional questions based on the e-mail.

In addition, we do not believe the record supports a conclusion that the verdict was based simply on C.B.'s word against Clark's. As discussed above, there was substantial evidence that C.B. began experiencing significant depression and behavioral problems the year that he saw Clark. There was also the Iowa City police officer's testimony

---

Q: When you hear or sense that people are talking about you, what are they saying? A: I mean, I couldn't really make it out. It would just be like I randomly hear my name or something. I didn't know, you know, if somebody was talking to me. But then I would like—I would look around and no one would even be talking.

Q: Now, is it your testimony that when—that when—in your letter when you said you have been seeing and hearing things your whole life, you really only meant in the last couple of years? A: Yes.

Q: How come—just a thought. In that same letter you talk about using drugs for the last couple of years. Why didn't you talk about that in terms of your whole life? A: I don't know. I mean, I just kind of like thought that was like pretty much when my life started, you know. Like the first large chunk of it was, you know, just kind of nothing, you know, never, ever happened. I was just—

Q: That's in the years leading up to the fifth grade? A: Yes. It was just normal.

Q: But it's not really true, is it? A: No.

Q: You were struggling even before fifth grade, weren't you? A: Yes.

Q: That's why you changed schools? A: Yes.

Q: That's why you were in counseling in the first place with Mr. Clark? A: Yes.

that Clark had told him "he did not touch *or rub* [C.B.] in any way" before the officer brought up any allegations of rubbing.

Most notably, we believe the testimony regarding the covering of Clark's office window at the elementary school was an important facet of the case. Clark's testimony as to *whether* the window was covered and the *reason* for it being covered conflicted sharply with that of two former school employees called by the State. The State devoted about one-fourth of its rebuttal closing argument to this issue and the conflicting testimony.

Clark has not made a convincing showing that a substantial right was prejudiced. Rather, he has offered a general assertion when a specific showing is required in order to show an abuse of discretion on the part of the trial court. *See State v. Webb*, 309 N.W.2d 404, 413 (Iowa 1981) ("bare assertions" about knowledge potentially held by undeposed witnesses did not "demonstrate prejudice to a substantial right"). In light of the foregoing discussion, we conclude that the district court did not abuse its discretion in denying Clark's motion for a continuance and request for redepositions.

**C. Ineffective-Assistance-of-Counsel Claims.** Finally, Clark makes a suggestion at the end of his briefing that he was denied the effective assistance of counsel at trial. The right to effective assistance of counsel is assured under the Sixth and Fourteenth Amendments to the United States Constitution and sections 9 and 10 of article I of the Iowa Constitution. *State v. Kendall,* 167 N.W.2d 909, 910 (Iowa 1969) (citing cases).

To succeed on an ineffective-assistance-of-counsel claim, a defendant must show by a preponderance of the evidence that: "(1) counsel failed to perform an essential duty; and (2) prejudice resulted." *State v. Maxwell,* 743 N.W.2d 185, 195 (Iowa 2008) (citing

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984)). "We can affirm on appeal if either element is absent." *State v. McPhillips*, 580 N.W.2d 748, 754 (Iowa 1998).

"Ineffective-assistance claims are an exception to our normal rules of error preservation." *State v. Rodriguez*, 804 N.W.2d 844, 848 (Iowa 2011). Such claims are normally considered in postconviction relief proceedings. *Id.* Even though such claims need not be raised on direct appeal, a defendant may do so if he or she has " 'reasonable grounds to believe that the record is adequate to address the claim.' " *State v. Johnson*, 784 N.W.2d 192, 197 (Iowa 2010) (quoting Iowa Code § 814.7). If we determine the record is adequate, we resolve the claim. *Id.*

In this case, any arguments on the subject of ineffective assistance of counsel have been raised in "a general or conclusory manner." *Id.* at 198. For this reason, the record is not sufficient for us to address them. *Id.* We therefore leave them to be determined in a possible postconviction relief proceeding.

**IV. Conclusion.**

Our holding that the district court did not violate Clark's constitutional rights or abuse its discretion when it refused to allow redepositions or grant a continuance does not constitute an endorsement of the prosecution's behavior. The State's reasons for not immediately producing the entire e-mail to Clark were flimsy and unsupportable. The State implicitly recognized as much when it gave Clark's counsel the complete e-mail at the beginning of the February 5, 2009 hearing.

For the reasons stated, we affirm Clark's conviction and sentence.

**JUDGMENT OF THE DISTRICT COURT AND DECISION OF THE COURT OF APPEALS AFFIRMED.**

All justices concur except Hecht and Appel, JJ., who dissent.

**APPEL, Justice (dissenting).**

I dissent.

This case involves a claim of sexual abuse made by a troubled sixteen year old, six years after the alleged crime. While there was some additional evidence on the periphery, this criminal proceeding was essentially a "he said, he said" case. The defendant, a school counselor, faced a mandatory minimum prison term of seventeen and one-half years if convicted of the offense.

In this kind of case, nothing is more important than thorough, methodical, and strategic pretrial preparation of a plan to meet the testimony of the alleged victim. Yet, in this case, the trial court refused to grant even a brief continuance in the case after a highly significant four-page, single-spaced e-mail written by the alleged victim to his parents relating to the underlying events was produced only on the eve of trial.

I do not quarrel with the majority's statement of facts and procedural issue or with its discussion of the standard of review of the issues posed in this case. In my view, however, the failure to grant a short continuance, under all the facts and circumstances of this case, was an abuse of discretion and a violation of the right to effective assistance of counsel. While the majority attempts to varnish the facts, there is no question in my view that this criminal defendant did not receive the assistance of aggressive, well-prepared counsel. I therefore dissent.

## I. Abuse of Discretion.

I begin my discussion with recognizing that preparation is critically important to any criminal defense. As noted decades ago by Justice

Sutherland in the Scottsboro Case, perhaps the most critical period in a criminal proceeding is the period between arraignment and trial because "consultation, thorough-going investigation and preparation [are] vitally important." *Powell v. Alabama*, 287 U.S. 45, 57, 53 S. Ct. 55, 59–60, 77 L. Ed. 158, 164 (1932). The Standards for Criminal Justice of the American Bar Association requires defense counsel to "explore all avenues leading to facts relevant to the merits of the case." ABA Standards for Criminal Justice: Prosecution and Defense Function 4-4.1 (3d ed. 1993). According to one noted authority, "[t]he outcome of a criminal trial is astonishingly correlative to the thorough nature of defense counsel's investigative preparation." 1 Fred Lane, *Goldstein Trial Technique* § 4:9, at 4-66 to 4-67 (3d ed. 2011) [hereinafter Lane].

In particular, developing a plan for cross-examination of key witnesses requires "careful preparation and painstaking effort." John A. Burgess, *Persuasive Cross-Examination*, 59 Am. Jur. Trials 1, 25 (1996). "Without preparation, cross-examination is like fishing through the ice. Something may be there, but the fisherman has no clue as to what is there, where it is, or which bait will attract it." *Id.* at 23. Thorough preparation is essential in order not only to determine what questions to ask, but what questions not to ask. *Id.* at 27–28. Thus, effective cross-examination may win a case, but improper cross-examination may destroy a case. 4 Lane § 19:1, at 19-5.

As a result, when a defense lawyer indicates that he or she needs more time to prepare an effective defense based upon a highly relevant document produced on the eve of trial that relates to the likely testimony of a key prosecution witness, where there is no indication of gamesmanship in the request, and where there have been no prior

continuances, the defense lawyer ordinarily should be given some leeway to develop his case.

A second factor weighing in favor of a continuance is the nature of the evidence in this case. Though there was some circumstantial evidence related to covering of windows of the office occupied by Clark at the elementary school where the crime allegedly occurred, this case was, for the most part, a "he said, he said" dispute. Developing a plan of cross-examination of the alleged victim is an especially critical part of this case. The mere fact that there was an opportunity to cross-examine the defendant at trial based on a document disclosed on the eve of trial is not enough. When an important new document that goes to the heart of the issues in a case is disclosed on the eve of trial that directly relates to the expected testimony of the alleged victim about the crime, a defense request for a continuance to allow it to step back, carefully review the document, and recalibrate its approach to trial is entirely reasonable.

A third factor supporting a continuance is the germaneness of the e-mail to the issues at trial. While the material in a previous deposition of C.B. taken by the defense overlaps with the document to some extent, the e-mail is full of interesting phrasing and statements that amount to new evidence. Among other things, the letter contained statements or evidence that:

> (1) C.B. may have stereotyped thinking that might have played a role in a claim made against a gay man ("[I] bet the slums was a hell of a time to drive through seeing [the] monkeys haha");

> (2) C.B. kept a journal including a "confession letter," which might lead to additional evidence;

> (3) C.B. considered his father, who had previously asked him about his relationship with Clark, a "badass mofo," thereby suggesting that C.B. may have wanted to identify Clark in conformance to his father's suggestions;

(4) showed strong desire on the part of C.B. to leave his residential school setting ("[It's] bullshit being here" and characterizing the setting as a "shithole");

(5) a general statement that youth in the residential facility lie about problems (kids in the residential school "lie about this shit");

(6) followed by a specific admission by C.B. that "I'm constantly lieing [sic] to people about shit that happens";

(7) a declaration that "you guys better get me out of this fucking place" and "[I] finally got the courage to put this out here and . . . this is why [I] really [don't] need to be here");

(8) C.B. considered himself schizophrenic, paranoid, and that he had delusions, but his parents refused to have him tested;

(9) a statement by C.B. that a residential counselor did not seem to believe his statements regarding his mental health condition.

This is the kind of material that can make or break a criminal case where veracity of the alleged victim is a crucial contested matter.

A fourth factor in determining whether a continuance should be granted is the seriousness of the offense. Courts have repeatedly stated that the seriousness of the charge is a critical factor in determining whether there has been adequate preparation time. *Wolfs v. Britton*, 509 F.2d 304, 309 (8th Cir. 1975); *Rastrom v. Robbins*, 440 F.2d 1251, 1255 (1st Cir. 1971); *Townsend v. Bomar*, 351 F.2d 499, 502 (6th Cir. 1965). In this case, the defendant was facing a twenty-five year sentence with a mandatory seventeen and one-half year term. In the exercise of discretion related to a continuance, the interest of the defendant in light of the severity of the potential sanction is a very weighty interest. This case did not involve parking tickets, but a serious criminal offense that carries a long prison term and justifiable community opprobrium.

A fifth factor is the inadequacy of alternative remedies. As has been noted, it is far preferable for the judge to monitor the adequacy of preparation before trial begins than to wait until a trial has occurred when remedial action becomes more difficult. *Monroe v. United States*, 389 A.2d 811, 818–19 (D.C. 1978). This is because it is very difficult to judge the impact of a decision after the fact as required under the test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Whatever else might be said about *Strickland*, it is a very imperfect tool, requiring the court to reconstruct Humpty Dumpty, determine what should have happened at trial, and then speculate about what a jury would have done if the defense counsel put on a different case. We do our best in making such assessments, of course, but appellate court assessments are often highly speculative and impressionistic. Further, the assessments of seven experienced and trained judges on appeal may not necessarily mimic the common sense judgments of a jury in a criminal trial. As a result, it is better to eliminate potential problems with adequate representation up front prior to trial by being somewhat generous with respect to defense requests rather than to deal with resulting problems on the back end with the very blunt post hoc *Strickland*-type tools. *See Simmons v. State Pub. Defender*, 791 N.W.2d 69, 85 n.9 (Iowa 2010).

I now turn to countervailing factors. As pointed out by the majority, the defense attorney did not provide specific details in his motion to continue other than the desire to conduct further investigation and perhaps reopen the deposition. However, the defense just received the e-mail a few minutes before the motion for a continuance was first heard and had no time to study it. While more review could have occurred over the weekend prior to the renewal of the motion the

following Monday, defense counsel was no doubt preparing for the upcoming trial. In any event, the need for further time to plumb the significance of a four-page, single-spaced e-mail with lots of descriptors and color directly related to the central facts of the case ought to be obvious.

Further, the reasonableness of the request was obvious from the document itself. The five-page e-mail is obviously a very useful document. Yes, it covers some of the same ground revealed at the prior deposition of C.B. Yet, there are intriguing statements, an intriguing use of language, and lots of context that needed to be integrated into the defense case. Exploration of these features of the e-mail in a reopened deposition could well have led to a more effective cross-examination of C.B. at trial.

I do not deny that the lawyer in this case perhaps could have been somewhat more artful in alerting the court to the usefulness of the e-mail and could have been more specific, but the unedited e-mail was produced only at the beginning of the hearing on the motion to continue and, obviously, trial counsel had not had an opportunity to review it. While the motion was renewed on the following Monday, counsel still had very little time to sharpen the argument and was no doubt preparing for the upcoming trial.

Further, the fact that the e-mail was available for use at trial and that the defense attorney conducted cross-examination based upon the document does not resolve the problem. Without the benefit of a pretrial deposition on the e-mail, counsel may have been deterred from a more thorough exploration of the e-mail at trial for fear of experiencing the sting of asking one question too many. The mere appearance of in-court effectiveness simply cannot compensate for inadequate pretrial

investigation. *United States ex rel. Spencer v. Warden*, 545 F.2d 21, 24–25 (7th Cir. 1976); 3 Wayne R. LaFave et al., *Criminal Procedure* § 11.7(d), at 821 (3d ed. 2007) (stating the requirement of a fact-specific finding of ineffectiveness allows "too many cases of incompetency to survive judicial review, as counsel's inadequacies are often hidden in investigative failure and prejudice to the defendant takes forms that are often imperceptible"). Indeed, proof of the prejudice from lack of adequate preparation may well be absent from the record precisely because of the lack of preparation. *See United States v. Tucker*, 716 F.2d 576, 593 (9th Cir. 1983) (stating when pretrial investigation and preparation is inadequate, the record is necessarily incomplete as to extent of prejudice).

It is, of course, true that a brief continuance would impose some burdens on the parties and the witnesses. However, this was not a case involving dozens of witnesses who were subpoenaed to appear on a given date or where expert witnesses were traveling from afar. A brief continuance would have posed almost very little burden on the prosecution and third parties. Indeed, to the extent the defense sought to depose C.B., the deposition could have occurred over the weekend and thus eliminated the need for a continuance.

In light of the nature of the late disclosure, the critical nature of adequate trial preparation to an effective defense, the severity of the potential sanction involved, the lack of alternative post hoc remedy, and the lack of substantial prejudice to the State, I think it clear that it was an abuse of discretion for the district court to deny even a brief continuance in this case.

## II. Violation of Right to Counsel.

Clark also raises a claim that the denial of the motion to continue violated his rights to due process under the Fifth and Sixth Amendments to the United States Constitution and under article I, sections 9 and 10 of the Iowa Constitution.

In *State v. Gambell*, 262 N.W.2d 792 (Iowa 1978), we considered whether constitutional error occurred in a murder trial where a deposition of the State's witnesses were taken by tape recording rather than stenographic means. Under the circumstances, the accuracy and the trustworthiness of the tapes was open to question. The court concluded that by having the depositions only on tape rather than in stenographic form, the court "handicapped defendant's counsel and precluded effective assistance of counsel to the defendant" as required by the Fourteenth Amendment and article I, sections 9 and 10 of the Iowa Constitution (due process and effective assistance of counsel). *Gambell*, 262 N.W.2d at 795.

In support of its decision, the *Gambell* court cited *State v. Williams,* 207 N.W.2d 98 (Iowa 1973). In that case, the court emphasized that failure to allow counsel to adequately prepare for trial does not satisfy due process. *Williams*, 207 N.W.2d at 104. In *Williams*, however, the defense counsel made a naked claim that he needed an investigator without suggesting the subject matter of inquiry and making it impossible for the court to determine necessity as required by Iowa statutes. *Id.* at 105–06. Here, there was no statutory obstacle to granting the relief sought, and, in any event, counsel stated he needed to follow up on information contained in a specific document.

Surely this case is as problematic as *Gambell*. In *Gambell*, by providing only for tape recordings of depositions, it was harder for

defense counsel to prepare for cross-examination and to conduct cross-examination at trial. *Gambell*, 262 N.W.2d at 795. Here, as shown above, the problems are in some ways even more acute as counsel did not have an opportunity to explore a number of important statements contained in the e-mail. I would therefore find a due process violation under article I, section 9 of the Iowa Constitution.

I recognize that the majority does not preclude a potential postconviction relief claim based on ineffective assistance of counsel. But I fear this will be a catch-22 proposition. The claim that counsel was unable to adequately prepare for trial is rejected by the majority, at least in part, for lack of specificity, but then, in a postconviction proceeding, the court may find that counsel's failure was reasonable given the time constraints and, as a result, the first prong of *Strickland* has not been met. Or, in the alternative, it will gloss over the problems and simply conclude that there was no showing of concrete prejudice.

**III. Conclusion.**

For the above reasons, I would reverse the judgment of the district court and remand the case for a new trial.

Hecht, J., joins this dissent.