# IN THE COURT OF APPEALS OF IOWA

No. 14-1380
Filed October 28, 2015

STATE OF IOWA,
          Plaintiff-Appellee,

vs.

TREVOR EUGENE SMITH,
          Defendant-Appellant.
_____

          Appeal from the Iowa District Court for Black Hawk County, Kellyann M.

Lekar, Judge.


          Trevor Smith appeals his conviction for first-degree murder. **AFFIRMED**

**IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**




          Mark C. Smith, State Appellate Defender, and Robert P. Ranschau,

Assistant Appellate Defender, for appellant.

          Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney

General, and Linda Fangman, County Attorney, for appellee.




          Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**DANILSON, Chief Judge.**

Trevor Smith appeals his conviction for first-degree murder, contending there was insufficient evidence of malice to sustain the conviction. He also contends his trial counsel was ineffective in failing to move for a new trial based on the greater weight of the evidence and in failing to call a biomechanical engineer in his defense. There was substantial evidence to support a finding of malice aforethought, and therefore the trial court did not err in overruling the motion for new trial. Smith's ineffective-assistance-of-counsel claims are rejected. We affirm the conviction for first-degree murder. However, we reverse the entry of judgment on the jury's guilty verdict on the charge of child endangerment resulting in the death of a child and remand with directions.

## I. Background Facts.

Trevor Smith and Samantha Christian moved in together in January 2012 knowing Christian was pregnant and Smith could be the father. Christian gave birth to a girl on August 7. Christian went back to work on September 25; her mother stayed with Smith and the infant and helped care for the child that day. On September 26, 2012, Smith was caring for the child alone. He called Christian at work at about 10:30 p.m. and told her an ambulance was on the way and the baby needed to go to the hospital.

Black Hawk County Dispatch recorded a 911 call at 10:32 p.m. On the recording, Smith reports, with a flat affect, that he was picking up the baby to burp her, she started choking, and he couldn't do anything about it. Police, fire, and paramedic teams arrived between four and five minutes after Smith placed the 911 call. An officer responding to the scene observed Smith to be calm.

Paramedics reported the infant was limp, very pale, and was not breathing. Her heart was beating, though she did not have a pulse. Smith told first responders he was feeding the baby, she started to gasp, and he was burping her when she stopped breathing. A mouth valve was inserted to provide oxygen, and the child was injected with epinephrine to "get the heart perfusing again."[1] The child was taken by ambulance to Covenant Hospital in Waterloo while the first responders continued CPR.

The ambulance arrived at the hospital at 11:00 p.m. Emergency-room physician Dr. Robert Roof intubated the child and got a pulse back. The child's blood gas was tested, and the oxygen levels were very low, indicating she had been without oxygen for a prolonged period of time—thirty to forty-five minutes. While at the hospital, Smith told Christian he was feeding the baby a bottle and she stopped breathing. He told Dr. Roof he was feeding the child and she became unresponsive. Because the child continued to be unresponsive,[2] she was sent by helicopter to Iowa City.

Dr. Gwen Erkonen, a physician and assistant professor of pediatrics at University of Iowa Hospitals and Clinics (UIHC), was one of the child's initial treating physicians. Dr. Erkonen stated the child was very unstable and critically

---

[1] Merriam-Webster dictionary defines perfuse: "to force a fluid through (an organ or tissue) especially by way of the blood vessels." http://www.merriam-webster.com/dictionary/perfuse

[2] Dr. Roof testified by nonresponsive, he meant

[n]o muscle tone, not making any—she was just flaccid, meaning she wasn't moving anything. She didn't have any strong refluxes or any response to either when we pinch—like, it can be painful stimuli like pinch or sternal rub to see if we can get them to respond in any way. She didn't have any of those.

ill on arrival.[3] A CT scan showed an acute bilateral subdural hemorrhage. Additional testing also revealed a subarachnoid hemorrhage. A drain was placed to relieve some of the pressure on the child's brain. At the Iowa City hospital, Smith told Dr. Resmiye Oral—a physician specializing in child abuse pediatrics— he was attempting to feed the baby a bottle at about 9:30 p.m. and when he put her over his shoulder to burp her she went limp, and he laid her on the bed and attempted to call her mother. He then called 911 (which was recorded at 10:32). The EMS technician recommended he perform CPR. Smith told Dr. Oral that with each blow of air into her lungs, he was hearing gurgling sounds coming from the chest, and he also observed milk coming out of her nose.

On September 27, police spoke with Smith and Christian. Christian initially told police the child was gasping and went stiff while he was feeding her. He would later tell them he "never like intentionally shook her" and admitted that "she did slip outta my hands." Still later, Smith stated "I did shake her" but "didn't think I did it very hard." He said he shook the baby until her head moved "side to side" and that he shook her three-to-five times for "one or two" minutes. Smith also told Christian and workers for the department of human services he shook the baby because she wouldn't stop crying.

The child remained in a coma with a prognosis of a persistent vegetative state. On October 2, the child's breathing tube was removed, and the child died.

---

[3] Erkonen testified,

> She needed the neurosurgical intervention, so she needed the drain put in her brain. She needed medicine to support her blood pressure, that goes continually. She needed ventilator support, so we had to breathe for her and support her heart rate and blood pressure with the medicines and to have the neurosurgeons come and place the drain.

An autopsy was conducted the following day by Dr. Dennis Firchau.  The autopsy showed that child had a subdural and subarachnoid hemorrhage.  The subdural hemorrhage was "acute" or recent.  Dr. Firchau found nothing of significance in the external examination except for a contusion on the left scalp.  A contusion of the subscalp was also found.  Dr. Firchau would testify that the contusion was indicative of blunt force trauma.  An epidural hemorrhage was also found in the spinal column.  The autopsy also indicated the child had suffered rib fractures, which were most likely caused by resuscitation efforts.  Dr. Nasreen Syed, an ophthalmologic pathologist, examined the eyes post-mortem.  She found hemorrhages in both eyes, including intraretinal hemorrhaging and optical nerve sheath hemorrhages, and that the retinas had begun to fold and detach.  Dr. Patricia Kirby, a neuropathologist, examined the brain as part of the autopsy, finding a "fairly extensive subdural hemorrhage" that was "a couple of days old."  She also confirmed the subarachnoid hemorrhage reported by other doctors; the bleeding was extensive and bilateral.  Based on the pathologists' findings, the cause of death was ruled "blunt force injuries of the head."  The manner of death was ruled a homicide or "death at the hands of another."

Smith was arrested on January 14, 2013, and was interviewed at the Waterloo police station.  He told the police there were two different periods of shaking, one about 4:00 p.m. and one about 9:30 p.m.  He also said that it was possible the baby's head hit a large fan while he was carrying her in the afternoon or evening.  He said the shaking was not an accident.  He also said he dropped the child onto a pillow, onto a couch, and onto a changing table.

Smith was charged with child endangerment causing death and first degree murder. At trial, the State presented the testimony of Drs. Roof, Erkonen, Michael D'Alessandro, Firchau, Syed, Kirby, and Oral. Of eight potential causes of the child's injuries, these doctors ruled out all but non-accidental trauma. Dr. D'Alessandro, a physician at the Children's Hospital at UIHC, reviewed the CT scans. He was asked what he meant by non-accidental trauma and responded, "I mean another word for it is child abuse."

> Q. Um, do—do you have an idea of what the mechanism would have been? A. Well, the mechanism is described in non-accidental trauma as you can get this from shaking a child vigorously, you can get it from shaking and slamming the child on a surface, you can get it from slamming and shaking the child. So any combination of those results in this sort of rotational injury, deceleration injury, that can lead to tearing of the blood vessels in the brain, lead to the subdural hematomas that we see, and it can also damage the brainstem which controls your breathing and your heart, causing the heart to stop breath—to stop, and, again, causing—leading to what I—we see here.

He also testified,

> There—there is some dispute in the medical literature over whether shaking alone can cause this sort of injury, and it's something that people who are biomechanical engineers and neurosurgeons and neuropathologists discuss and go around in circles about, but in this case, we also have evidence of some sort of impact injury with the contusions in the scalp, so I think that it's a non-accidental injury that was shaking and slamming in this case.

Dr. Oral testified,

> Q So that the—at that point [after learning that Smith had shaken the baby], then, you were—your assessment was that they were those types of injuries, rotational deceleration/acceleration, and that a possible mechanism was due to shaking; correct? A. Yes.
> . . . .
> Q. Is it common or uncommon to find bruising from the holding of the child? A. It's actually uncommon.

Q. And why is it uncommon? A. Because majority of abusive head trauma doesn't occur with the intention of hurting the child or killing the child. It occurs just as a result of exhaustion or frustration, etcetera. And because of that, majority of the time, people don't necessarily inflict external injuries.[4] And another thing, I'm saying this just for the education of everybody here, shaking, unfortunately, has a positive reinforcing effect on the caretakers because the child becomes lethargic or obtunded and falls asleep, and the caretaker mistakenly perceives that as, oh, it's working, she falls asleep if I shake her or him. And as a result, I am not saying abusive head trauma perpetrators are monsters. They are not. They are routine people who just don't know how to handle a crying baby.

Dr. Janice Ophoven, a pediatric forensic pathologist, testified on behalf of the defense. Dr. Ophoven testified, "In my opinion in this case, the evidence available to me is insufficient to make a determination for certain what happened to" the child. She explained:

Most important point is that babies of this age have sudden unexplained death without a cause being identified as the number one cause of death in children between two and four months of age. So[,] unexplained and unexpected deaths in young infants is not an unusual event. It's certainly not common, but it is something that forensic pathologists recognize.

The second point is that for any reason, for any cause of cardiac arrest, hypoxia can cause subdural blood and brain swelling and bleeding in the eyes. That's compounded by prolonged resuscitation and complications of prolonged life support in the hospital that can aggravate and worsen what is seen at postmortem. It is entirely possible for the child to have had a cardiac arrest from a condition that was not traumatic, that was not —that we don't—that we don't know the cause. Subdural brain swelling and retinal hemorrhages can occur from lack of oxygen.

The findings in this case that are—are concerning is the finding that the pathologist found a spot on the side of the head that he interpreted as a bruise, which, in his opinion, as I understand it, could have been the result of an impact. In my opinion, that bruise could as likely be the result of the surgical intervention that occurred during the attempts to save the baby's life. There was no swelling in that area, as one would expect of a serious impact. We typically look for on x-ray or on physical exam, no swelling was

---

[4] There was evidence presented here that there were external injuries inflicted.

noted. And a mark wasn't observed by the first responders and by the emergency room doctors suggesting that the material that was seen at postmortem may have developed while the child was in the hospital. So I personally, in my opinion, cannot rely on that mark as an indication of an inflicted impact.

Also found at the postmortem were scattered BAP positive axons or cells in the corpus callosum of the brain. Those could indicate trauma, but they don't tell us when or how or how severe. Their distribution in nature are not the kind that I typically see in children who would survive five days following a fatal traumatic injury. They're scattered over quite an area and not clustered or dense the way I'm typically used to seeing.

The answer to the question is, I don't know why the child had a cardiac arrest. The subdural could have been the consequence or could have been associated with the cause. I don't know.

Dr. Ophoven testified,

[T]he theory being that if you shake a child hard enough, you can cause a—a specific pattern of damage that is reflected in subdural hematoma, brain swelling, and retinal hemorrhage. That theory was never tested, but it was accepted. So for many years, any child with retinal hemorrhage, subdural hematoma, and brain swelling were presumed to have been the victim of shaking. In the '80s and '90s and now ongoing, this theory has come under testing and criticism and now controversy in that the assumption that retinal hemorrhage and subdural hematoma and brain swelling are, in effect, diagnostic for an assaultive form of shaking has—has not been—has not met scientific tests or proof. And biomechanical and neuropathological research has clearly identified significant problems with this theory. No one's saying shaking is a good idea, but the—the biomechanical literature strongly suggests that there's not enough force that can be generated by an adult person to actually cause the damage we're talking about. And that's been repeatedly reported, and concerns have been published repeatedly. So the issue of whether or not that act or action in and of itself is sufficient to cause a fatal injury remains a theory and not a proven scientific fact.

She went on to discuss the amount of acceleration—G forces—required to cause fatal head injuries, and opined the autopsy results did not support a finding that such force had been inflicted. On cross-examination, Dr. Ophoven agreed that there were various causes of infant cardiac arrest, including head trauma. She

acknowledged "nothing was found in her—during her hospitalization that explained a natural cause for her cardiac arrest."

Smith testified in his own defense. He explained feeding the baby at 4 p.m. He stated he was "frustrated in the fact that [he] could not get her to stop crying." He acknowledged he shook the child, stating he "was trying to comfort [his] daughter." Smith said the child woke up again at 6 p.m. crying, he tried to give her a bottle but she drank only about an ounce of milk. So, he gave her a pacifier and she eventually went back to sleep. The child woke again at 9:30 crying and he changed her and gave her a bottle. He continued,

> After she had finished the bottle, I had—I was attempting to sit her up so I could burp her. At this time, she appeared to me to start gasping for air. And she also put her arms and legs straight out and they were stiff. I don't remember exactly how long that had happened, but I would say anywhere from about a minute to two minutes, and then she went limp in my arms.

He stated he tried to call Christian three times because "[s]he was a nurse" and he "figured she would know" what to do. When he did not reach Christian, Smith called 911. He acknowledged that the recordings of his statements to police and him demonstrating how he had shaken the child were correct. He acknowledged he may have dropped the baby and that "her head did hit the changing table."

The jury found Smith guilty of first-degree murder and child endangerment causing the death of a child. The trial court entered judgment on both but entered a sentence on count 1 (first-degree murder) only.[5]

---

[5] The court did not merge the convictions, however. Iowa Code section 701.9 provides,
> No person shall be convicted of a public offense which is necessarily included in another public offense of which the person is convicted. If the jury returns a verdict of guilty of more than one offense

Smith appeals, contending there was insufficient evidence of malice aforethought to sustain the conviction. He also contends his trial counsel was ineffective in failing to move for a new trial based on the greater-weight-of-the-evidence standard and in failing to call a biomechanical engineer in his defense.

## II. Scope and Standards of Review.

We review claims of insufficient evidence for correction of errors at law. *State v. Showens*, 845 N.W.2d 436, 439 (Iowa 2014).

> "In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. We will uphold a verdict if substantial record evidence supports it."

*Id.* at 439-40 (quoting *State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013)).

We review claims a defendant's trial attorney was ineffective de novo. *State v. Clark*, 814 N.W.2d 551, 560 (Iowa 2012).

## III. Discussion.

*A. Sufficiency of the evidence.* We have already summarized the evidence presented at trial and conclude the evidence could convince a rational jury beyond a reasonable doubt that Smith acted with malice. The jury was instructed that "[m]alice may be inferred from the commission of child endangerment which results in death." *See* Iowa Code §§ 707.2 (stating a person commits murder in the first degree when "[t]he person kills a child while committing child endangerment under section 726.6, subsection 1, paragraph 'b'"); 726.6(1)(b) (defining child endangerment as "an intentional act or series of intentional acts,

and such verdict conflicts with this section, the court shall enter judgment of guilty of the greater of the offenses only.

uses unreasonable force, torture or cruelty that results in bodily injury, or that is intended to cause serious injury"). Smith acknowledged shaking the child and dropping her more than once. He acknowledged the child hit her head on the changing table. From his testimony, the jury could find that he shook the child at 4 p.m. and again at 9:30 p.m. when the child became unresponsive. He did not call 911 until 10:30 p.m. The evidence showed the child's brain was without oxygen for an extended period of time. The medical personnel testified the child suffered blunt force trauma, which resulted in her death. Substantial evidence supports an inference of malice from the nature and cause of the injuries to the child. Moreover, an inference of malice was properly based on a finding of guilt on the child endangerment charge.

The district court's order entered judgment on both first-degree murder and child endangerment resulting in the death of the child (although it imposed only one sentence). We affirm the entry of judgment on the conviction for first-degree murder. However, we reverse the entry of judgment on count 2 (child endangerment resulting in death).[6] *See id.* § 701.9 ("If the jury returns a verdict of guilty of more than one offense and such verdict conflicts with this section, the court shall enter judgment of guilty of the greater of the offenses only."). We remand with directions that the district court delete entry of judgment on count 2.

*B. Ineffective assistance of counsel.* To succeed on an ineffective-assistance claim, a defendant must show by a preponderance of the evidence that trial counsel failed to perform an essential duty, and prejudice resulted.

---

[6] *See State v. Fix*, 830 N.W.2d 744, 746 (Iowa Ct. App. 2013) ("Under Iowa law, when a defendant is convicted of separate homicide counts involving a single victim, judgment can be entered and sentence can be imposed for only one homicide offense.")

*State v. Rodriguez,* 804 N.W.2d 844, 848 (Iowa 2011). We can affirm if either element is absent. *Id.* Ordinarily, we do not decide ineffective-assistance-of-counsel claims on direct appeal, preferring to reserve such questions for postconviction proceedings so counsel can defend against the charge and a more complete record developed. *Clark,* 814 N.W.2d at 560. However, we find the record adequate to address the complaints.

Here, Smith contends his trial attorney was ineffective for failing to include as a ground for new trial that the verdict was contrary to the weight of the evidence, particularly the medical evidence. Under the contrary-to-the-weight-of-the-evidence standard, the trial court has a broader power to weigh the evidence and consider the credibility of the witnesses. *See State v. Ellis*, 578 N.W.2d 655, 658 (Iowa 1998) (citing 3 Charles A. Wright, *Fed. Prac. & Proc.* § 553 (2d ed. 1982)). "If the court reaches the conclusion that the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted, the verdict may be set aside and a new trial granted." *Id.* at 658-59 (citation and quotation marks omitted). However, trial courts are cautioned to grant a motion for a new trial on this ground "carefully and sparingly" because "a failure to follow [this admonition] would lessen the role of the jury as the principal trier of the facts and would enable the trial court to disregard at will the jury's verdict." *Id.* at 659. Smith has not established that this is the exceptional case in which the evidence preponderates heavily against the verdict. *See State v. Dudley*, 766 N.W.2d 606, 620 (Iowa 2009) (noting "counsel has no duty to raise an issue that has no merit").

In alleging trial counsel should have filed a motion for new trial on grounds the verdict is contrary to the weight of the evidence, Smith is, in essence, making an alternative argument because such a motion concedes the sufficiency of the evidence. *See State v. Reeves*, 670 N.W.2d 199, 202, 209 (Iowa 2003) (noting "[a] motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain a verdict"). We reject that claim. *See Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001) ("Thus, claims of ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention to the responsibilities of an attorney guaranteed a defendant under the Sixth Amendment."). Although counsel can make alternative arguments, we decline to conclude that trial counsel can be ineffective for conceding substantial evidence existed to support the verdict to raise the weight-of-the-evidence argument, where both trial counsel and appellate counsel argue there was insufficient evidence to support the verdict.

Smith next asserts trial counsel was ineffective for not calling a "biomechanical engineer or other expert that would have been more informative regarding research developments in this field." However, he has not established the result of the trial would have been different had such a witness been called. He claims, "Whether shaking alone can cause serious brain injury and death has been challenged by biomechanical research . . . ." Dr. Ophoven testified about such research. Smith does not suggest what more an additional witness would

have provided, and he has not proved the result of the trial would have been different if such testimony was presented.

There was substantial evidence to support a finding of malice aforethought, and therefore the trial court did not err in overruling the motion for new trial.  Smith's ineffective-assistance-of-counsel claims are rejected.  We affirm the conviction for first-degree murder.  However, we reverse the entry of judgment on the jury's guilty verdict on the charge of child endangerment resulting in the death of a child and remand with directions.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**