**IN THE COURT OF APPEALS OF IOWA**

No. 14-1520
Filed July 27, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**SETH ANDREW TECHEL,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Wapello County, Daniel P. Wilson,
Judge.


        Seth Techel appeals his convictions of first-degree murder and
nonconsensual termination of a human pregnancy.  **AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant
Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Kevin Cmelik and Kristin Guddall,
Assistant Attorneys General, for appellee.


        Heard by Vogel, P.J., and Doyle and Bower, JJ.

**DOYLE, Judge.**

After two prior mistrials resulting from hung juries, a third jury found Seth Techel guilty of first-degree murder in the death of his wife, Lisa, and guilty of nonconsensual termination of a human pregnancy in the death of their unborn daughter. Seth appeals his convictions, challenging the district court's denial of his motions to continue and for a mistrial. He also claims the evidence was insufficient to support his convictions. Further, he asserts claims of ineffective assistance of trial counsel. Upon our review, we affirm.

### I. Background Facts.

Seth and Lisa Techel married in October 2011 and lived in rural Agency. Lisa worked as a jailer in Washington County, but she had aspirations to become a deputy sheriff like her father, Todd Caldwell, a longtime deputy sheriff in Wapello County. Seth also aspired to become a deputy sheriff and had interned with the Wapello County Sheriff's Office. Seth worked as a security guard but was leaving that position, having been hired by Wapello County to work as a jailer. Seth was also a volunteer firefighter. Thus, Seth and Lisa were generally known by those employed by the Wapello County Sheriff's Office and other first responders.

At 5:23 a.m. on May 26, 2012, Seth called 9-1-1 and reported Lisa had been shot. Seth described what happened that morning in varying detail during three separate, recorded conversations with law enforcement. The following is a summary of what Seth told law enforcement officers occurred.[1] Seth awoke at

---

[1] Any pertinent discrepancies are noted.

4:15 or 4:30 a.m. and took his dog outside.[2] Although the dog did not growl or bark while outside, Seth believed the dog was looking like something might have been outside or was acting like there was "something fishy going on." Seth went back inside, reset his alarm for 5:00 a.m., and lay back down. When the alarm went off, Seth got up and let the dog back inside, adding that he probably did not lock the door at that time.

Seth got in the shower while Lisa stayed in bed. Because the bathroom window had no curtains, Seth believed anyone outside the home could have seen inside and known he was in the shower. Approximately five minutes later,[3] he heard a loud noise that he took a moment to identify as a gunshot. He then got out of the shower, grabbed a towel, ran into the bedroom, and turned on the light. The dog was in the bedroom closet, scared and shaking, while Lisa was lying in the bed.

Seth went to Lisa, shook her, and asked if she was okay. Lisa moaned a little bit, and Seth saw there was a hole in the covers so he pulled them back and saw a hole in Lisa's bra.[4] He then heard a noise "like a little a thud" coming from the living room, so he grabbed his gun from the nightstand, removed it from the holster, and ran down the hallway. No one was in the living room, but the front door was "wide" open, so Seth ran out on the porch but did not see or hear anything.

---

[2] In one account, Seth stated he woke up to let the dog out at 4:15 a.m. In a later account, he stated his alarm awakened him at 4:30 a.m.

[3] Seth stated in one interview, he heard a gunshot five to ten minutes into the shower. In another, he stated it occurred no more than five minutes after the shower began.

[4] In an early account, Seth stated Lisa was not breathing at that time. In a later account, Seth stated Lisa was still breathing.

Seth went back to the bedroom where Lisa was unresponsive, was not breathing, and had no pulse.[5] Seth called 9-1-1. He was going to perform CPR but could not because he froze. Instead, he put on his underwear and shorts, which were lying next to the bed, and waited for emergency responders.

When the first responders arrived at the scene, Seth was on the porch wearing cargo shorts with a belt and underwear. He was not wearing a shirt or shoes. Seth remained outside while the emergency responders attempted to resuscitate Lisa, but it was too late; both Lisa and her unborn child died as a result of a gunshot wound. Based on Seth's report of an apparent intruder in the home, officers searched but did not locate anyone on the property.

When asked who might have been responsible for Lisa's death, Seth told law enforcement officers the first person that came to mind as a potential suspect was Brian Tate, his "crazy-ass neighbor who [thought he and Lisa were] terrorists." The neighbors were embroiled in an on-going, escalating dispute, in which a dead deer and its hide were thrown from one property to the other during the night. Seth speculated Tate had come over onto the Techels' property multiple times, though Seth had never witnessed it. Seth claimed he and Lisa would "come home at night and [Tate would] be sitting out there in the middle of his field on his four-wheeler pointed in [their] direction." Seth also "felt like [Tate] has been standing right against [their] fence line," though, again, Seth never saw him. On one occasion, Tate called the Wapello County Sheriff's Office to report dog feces and rocks had been dumped onto his property. Tate suspected the

---

[5] In one account, Seth stated when he returned to the bedroom, he rolled Lisa over, or attempted to, and saw the bullet hole.

Techels were responsible, though Seth denied any involvement in the incident.[6] Seth had also reported Tate to the sheriff's office for leaving items in the Techels' driveway, and Tate was reportedly very agitated during the investigation of that matter. Based on this history, Deputy Caldwell immediately suspected Tate was responsible for his daughter's death.

The Iowa Division of Criminal Investigation (DCI) assisted with the investigation into Lisa's death. In exploring other potential suspects, DCI Special Agent Chris Thomas asked Seth if Lisa had any problems with her coworkers. Seth stated approximately four or five months earlier, Lisa had received a text from a coworker saying "something to the effect of, hey, thanks for last night," and Seth "called [Lisa] on it." She told him she had given the coworker a ride home because he was not feeling very good but that was it. Seth denied being angry about it.

Agent Thomas also asked Seth to rate how happy he and Lisa had been on a scale of one to ten, with ten being happiness. Seth reported he and Lisa had been at an eight or nine on the night before the shooting. Initially, Seth stated that Lisa had been "probably more of a [ten]" that night. When Agent Thomas told Seth it had been reported Seth and Lisa had an argument that night, Seth explained Lisa had not been "upset" but explained "she was kind of giving

---

[6] Tyler Batterson, a friend of Seth's, would testify during Seth's third trial that in April 2012, Seth asked him and three of Batterson's friends to "mess with Tate." Batterson testified he and the others dumped five-gallon buckets of dog feces on Tate's porch and on his Blazer. They told Seth what they had done, and Seth laughed. The following weekend, Batterson and two others threw rocks onto Tate's garage and shed. They told Seth what they had done.

[him] shit" because he had not wanted to listen to the fetal heart monitor. Seth claimed Lisa "wasn't serious about it," "kind of confronting but not really."

Agent Thomas also asked Seth about any extramarital affairs. Seth initially reported he had been texting Rachel McFarland, a coworker, around January 2012, but he "wasn't seeing her, it wasn't anything, . . . nothing was coming of it" and their interactions were limited to the exchange of text messages in the vein of "hey, how was your day type of thing" and "hey, what's up." Lisa found out about the messages, but Seth claimed he let Lisa read the messages, he stopped talking to McFarland, and everything was fine. However, during the course of the interview, Seth kept amending his statements to reveal more and more information about the nature of his relationship with McFarland. For instance, though Seth initially claimed their involvement was limited to a "hey, what's up" texting exchange, he later admitted they had hugged and he had kissed McFarland "[o]n the cheek and once on the lip" before eventually confessing he and McFarland had kissed "[h]alf a dozen [times]. Dozen." Seth denied he and McFarland had ever had sex. He did admit that just two weeks before the shooting, he and McFarland had been together while Lisa was looking for him, and his friend had to "cover" for him.

Eventually, Seth conceded there was "obviously more to this Rachel thing" and the agent would see on his phone McFarland was under the impression Seth was leaving Lisa. Seth denied this was his intention, telling Agent Thomas, "I wasn't. I couldn't. Lisa and I had our arguments over [it], you know, who doesn't? We've been together for seven years." Seth admitted McFarland was also under the impression that Lisa was going to be packing her stuff up and

leaving either the night before or that day. Again, Seth claimed he was not going to leave Lisa and planned to tell McFarland it was over, stating, "I married Lisa, I made a commitment, we're having a baby, that's that."

Agent Thomas asked Seth to make a list of the firearms that were in his house. Seth did so, but he failed to include a Mossberg 12-gauge shotgun that a friend had left at the residence. On May 27, 2012, deputies found the Mossberg 12-gauge pump shotgun in some tall grass on the Techels' property. A fired shell casing was in the chamber, and four unfired deer slugs were in the magazine. The DCI laboratory determined the shotgun had fired the deer slug that killed Lisa.

## II. Proceedings and Trials.

The State charged Seth with first-degree murder and nonconsensual termination of a human pregnancy. The first two trials resulted in mistrial when each jury was unable to reach a unanimous verdict. After a change in defense counsel and venue, the State pursued a third trial.

In December 2013, the parties agreed to a trial date of July 14, 2014, in order to allow Seth's new counsel time to review the transcripts and evidence and to prepare the case for trial. However, by May 2, 2014, Seth's counsel felt there was inadequate time to fully prepare for a July trial and requested a continuance, arguing the State had not obtained Lisa's phone records and counsel needed "time to get that and absorb that material," as well as time to plan a strategy. Although counsel conceded that, "if push comes to shove, we could probably hurry up and get this done by July 14th or 15th," counsel believed that doing so would be unfair to Seth. The court denied a continuance, stating

the request "boil[ed] down to the nature of the massive undertaking that [defense counsel] assumed when they agreed to represent [Seth] in this case" and "no specific issues concerning witnesses, discovery, or examination of evidence or other critical issues were cited by counsel that would rise to the level of potentially prejudicing [Seth] concerning his counsels' preparation for trial."

On May 19, 2014, Seth requested a forensic examination of Lisa's cell phone at the State's expense. Based on information obtained during that examination, Seth issued a notice of deposition of Jason Tinnes, one of Lisa's coworkers. Seth again moved[7] to continue the trial, noting the DCI's report of its examination of Lisa's phone, which counsel received on June 2, 2014, had led to the subpoena of Lisa's cell phone records. The motion noted counsel not yet received Lisa's or Tinnes's cell phone records, as had been requested, and Tinnes was unavailable for deposition until July 8—only six days before the scheduled trial. The court again denied a continuance.

On July 11, 2014—the Friday before trial—Seth requested a continuance for the third time, based on information revealed during Tinnes's deposition. Tinnes admitted he and Lisa had engaged in a sexual relationship, which counsel argued gave Tinnes a motive to kill Lisa. The State resisted a continuance, arguing Seth could admit evidence of the affair through Tinnes's testimony. Seth's counsel explained that during Tinnes's deposition, they also learned it was Tinnes's understanding that someone in the Washington County Sheriff's Office had been contacted by the Wapello County Sheriff's Office about text messages

---

[7] The motion was emailed to State's counsel on July 5, 2014. The motion was filed with the clerk's office on July 8.

on Lisa's phone. A week to ten days after Lisa's death, a Washington County sheriff's deputy questioned Tinnes about the text messages, and Tinnes denied any affair. Defense counsel argued that it appeared law enforcement knew of the affair from Lisa's text messages. Defense counsel had never seen the messages in question because they had been deleted from the phone. Counsel wanted to investigate whether the State had hidden exculpatory evidence and asked for time to depose employees of the Washington County and Wapello County Sheriff's Offices "to find out who told who to [do] what and where and when." The court denied the motion on the first day of trial, but it agreed time could be set aside during trial to allow Seth's counsel to depose others to follow-up with the investigation.

At trial, Rachel McFarland testified she became Seth's coworker in November 2011, and by December, their relationship had become more personal and flirtatious. McFarland testified she and Seth had sent each other nude or partially nude photographs. Around the end of January 2012, Lisa found the messages Seth had been texting McFarland on his cell phone and called McFarland. Lisa "was just very angry" and told McFarland "not to talk to her husband." McFarland stopped communicating with Seth on his regular cell phone, but Seth bought a TracFone[8] and created an email account in the name

---

[8] A TracFone is a "prepaid cell phone that does not require the purchaser to provide any identifying information." *See United States v. Ouedraogo*, 531 F. App'x 731, 736 (6th Cir. 2013); *see also* Matthew DeVoy Jones, Note, *The "Orwellian Consequence" of Smartphone Tracking: Why A Warrant Under the Fourth Amendment Is Required Prior to Collection of GPS Data from Smartphones*, 62 Clev. St. L. Rev. 211, 214-15 (2014) (explaining types and distinguishing features of cell phones). During his interview with Agent Thomas, Seth was asked for his cell phone number, and he gave the agent his regular cell phone number. When specifically asked if he had "any other cell phones at all," Seth answered "no."

of "Rick Jones" to continue their illicit correspondence. McFarland testified they sent sexual and flirtatious texts back and forth, and their relationship moved beyond e-mailing and texting when they kissed each other in late February or early March 2012. McFarland testified her relationship with her then-boyfriend ended around May 17 or 18, 2012, "basically because of Seth."

At about this time, she began a relationship with another coworker, Brandon Coffman. Seth knew of McFarland's relationship with Coffman, knew they had kissed, and seemed very angry and jealous about it. On May 20, 2012, through a series of texts, McFarland, in essence, told Seth she did not like being alone and wanted to be with him, but he was married, whereas Coffman was available to be with her. Seth indicated he was going to end his marriage with Lisa, and he and McFarland met that evening and made out, kissing and touching each other over their clothing. While they were together, McFarland received a call from Coffman, and Seth acted agitated and unhappy. Seth told McFarland he wanted to divorce Lisa and move in with McFarland, asking her to give him "two more weeks." When McFarland asked what he meant, Seth repeated, "Just give me two more weeks." McFarland later testified the statement concerned Seth giving a two-week notice to his employer.

The next day, May 21, McFarland texted Seth and told him she was not going to stop talking to Coffman until Seth was "done with Lisa." Although she enjoyed Coffman's company, she loved being with Seth. She also hated being alone. She asked, "[H]ow am I all yours if you go home to Lisa?"

On May 22, McFarland texted Seth and said she and Coffman hung out and she was really starting to like him. McFarland told Seth it was unfair for her to be alone and felt Seth "should try to be with Lisa at least till [the] baby is born."

On May 24, McFarland texted Seth and told him her parents wanted her to stay away from Seth if he was unsure if he was getting a divorce. She was excited Seth was going to ask Lisa for a divorce that evening, and she expressed her love for Seth. Later in the day, McFarland expressed some doubts Seth would talk to Lisa and told him maybe he should rethink it. Seth asked why, and McFarland responded she felt like he was making the wrong decision and did not want a divorce. Seth countered he did not think divorcing Lisa was what McFarland wanted. McFarland responded, "Uhh yes it is," and "I keep looking at our pic." She asked Seth if he really wanted to be with her, and he responded, "Forever." He told McFarland he loved her and to wish him luck.

The next day, May 25, McFarland asked what had happened with Lisa the prior evening, and Seth responded: "Well we talked. I told her I wasn't happy. She got mad. Then sad. Then I slept on couch and all she wants is for me to [be] there tonight after work when she packs." He then said, "So, hello, Mrs. Resuscitator," referencing his own nickname, Mr. Resuscitator. McFarland told Seth she felt terrible, and Seth replied, "[You] shouldn't Rachel. I figured [you] would [be] happy." McFarland told Seth she was happy but still felt terrible because Lisa was pregnant.

McFarland testified Seth's last message to her from his TracFone said, "I love you," and was sent at 1:54 p.m. on May 25. This was not, however, his last text message to McFarland. Her cell phone records show that starting at

1:56 p.m., she received numerous text messages from Seth's regular cell phone. Seth continued sending McFarland text messages from this phone until 11:19 p.m. on May 25, in which they discussed Lisa coming home to pack her things. McFarland texted Seth the next morning, May 26, but she did not hear back from him. By 8:38 a.m., she had heard Lisa had been murdered, and she texted Seth, "I heard what happened. Just letting you know that I am here for you if you need to talk. However, I am going to give you your space for a while."

Seth's counsel continued to investigate during the trial, deposing the Washington County Sheriff, a Washington County deputy sheriff, and redeposing Tinnes. Seth's counsel called all three to the stand to testify. Tinnes admitted he had had a sexual relationship with Lisa that began before she married Seth. Tinnes and Lisa had even discussed the possibility that Tinnes could be the father of her child, but he testified he knew he was not the child's father because "there was a period of time we were not engaged with sexual relations, and it was simple math." He admitted he lied about the affair because he did not want his wife to know. However, although he testified Lisa and he ended the sexual relationship about two months before she was murdered because they both realized what they were doing was wrong, he continued texting her until near the end of April 2012. Tinnes testified that after his conversation the sheriff's deputy seven to ten days after Lisa's death, he had no further involvement in the investigation until June 2014, when the prosecutor called him. Tinnes denied killing Lisa.

As a rebuttal witness, the State called Tinnes's wife. She testified she first learned of her husband's affair with Lisa just two weeks and two days earlier.

She testified her husband was sleeping with her in their house at the time of Lisa's murder.

At closing, Seth argued the investigation of Lisa's death had been sloppy—"Inconsistent. Incompetent. Incomplete." He argued he would not have murdered Lisa over some side relationship without sex. He pointed to others with possible motives or opportunities, such as Tinnes, Tate, and Rachel's former paramour.

The matter was submitted to the jury, and the jury found Seth guilty as charged. He now appeals.

### III. Discussion.

On appeal, Seth challenges the district court's denial of his third motion to continue and his motion for a mistrial. He also claims the evidence was insufficient to support his convictions. Further, he asserts claims of ineffective assistance of trial counsel. We address his arguments in turn.

### A. Motions to Continue and for a Mistrial.

Seth asserts the district court denied him due process[9] or abused its discretion when it denied his motions to continue and for a mistrial, which were based on the State's failure to disclose all of the information regarding Tinnes to the defense in 2012. He argues he needed more time to investigate information derived from Lisa's cell phone records; "[t]he ability to present the fact of Lisa[] and Tinnes'[s] affair does not solve the problem." Seth contends he

---

[9] Seth asserts his claims under both the Iowa and United States Constitutions. Although we have discretion to consider a different standard under our state constitution, neither party suggests a different analysis or offers any reasons for a separate analysis of the two. *See State v. Dewitt*, 811 N.W.2d 460, 467 (Iowa 2012).

demonstrated "good and compelling cause" and "substantial justice" would more nearly be obtained by the continuance.

We generally review a district court's denial of motions for continuance and for a mistrial for an abuse of discretion. *See State v. Gathercole*, 877 N.W.2d 421, 427 (Iowa 2016); *State v. Clark*, 814 N.W.2d 551, 560 (Iowa 2012). However, in so far as Seth asserts claims of constitutional error, our review is de novo. *See Clark*, 814 N.W.2d at 560*.*

Iowa Rule of Criminal Procedure 2.9 governs a trial court's decision to grant or deny a motion for continuance. It provides that "[t]he date assigned for trial shall be considered firm. Motions for continuance are discouraged. A motion for continuance shall not be granted except upon a showing of good and compelling cause." Iowa R. Crim. P. 2.9(2). "The burden rests on the one seeking a continuance to show that 'substantial justice will be more nearly obtained' thereby." *State v. Ruesga*, 619 N.W.2d 377, 384 (Iowa 2000) (citation omitted). "The decision to grant or deny a motion for continuance rests in the sound discretion of the trial judge." *State v. Artzer*, 609 N.W.2d 526, 530 (Iowa 2000). This includes the grant or the denial of continuances based on surprise. *See Clark*, 814 N.W.2d at 564. "The abuse-of-discretion standard means 'we give a great deal of leeway to the trial judge who must make [a] judgment call.'" *State v. Richards*, 879 N.W.2d 140, 145 (Iowa 2016) (citation omitted). Even if an abuse occurred, "reversal will not be warranted if error was harmless." *Id.* (citation omitted). Nor will a court's ruling "be disturbed on appeal unless an injustice has resulted." *Artzer*, 609 N.W.2d at 530.

Seth first contends the State failed to disclose exculpatory evidence as required by *Brady*. To prove a *Brady* violation has occurred, Seth must prove by a preponderance of the evidence that "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt." *DeSimone v. State*, 803 N.W.2d 97, 103 (Iowa 2011). Assuming without deciding the *Brady* claim was preserved, *see Irving v. Emp't Appeal Bd.*, ___N.W.2d___, ___, 2016 WL 3125854, at *6 (Iowa 2016), we turn to the underlying merits to resolve the issue.

Evidence is favorable to the defense when it is either exculpatory or could be used for purposes of impeachment. *DeSimone*, 803 N.W.2d at 105; *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995). It is true that the "prosecution 'has a duty to learn of any favorable evidence known to . . . others acting on the government's behalf in the case, including the police.'" *DeSimone*, 803 N.W.2d at 103 (quoting *Kyles*, 514 U.S. at 437). Generally, "the good or bad faith of the prosecutor is not relevant"; the State must simply disclose evidence, "regardless of whether the accused requests *Brady* material." *Id.* However, the evidence is not considered suppressed where the accused "either knew or should have known of the essential facts permitting him to take advantage of the evidence." *Id.*

There is no evidence, including the most recent deposition testimony of law enforcement officials, that anyone knew there was credence to the claim that Lisa and Tinnes were having an affair. There is no question that the Tinnes twist came as a surprise to both the prosecutors and Seth's counsel, and upon the eve of trial, no less. Tinnes lied from the get-go, and there is no evidence law

enforcement officials had any reason to disbelieve him; there is no evidence that the information obtained from Lisa's phone in 2012 required further development of that evidence. We agree with the State that the evidence here was not suppressed. Furthermore, like in *Clark*, Seth only advanced "vague and uncertain" reasons for a continuance and "made no showing that any information he would have obtained from further investigation would be material to his defense." *See* 814 N.W.2d at 562.

In any event, Seth was able to use information of the affair in his trial to support his defense and discredit Tinnes. "A mid-trial disclosure 'suffices if time remains for the defendant to make effective use of the exculpatory material.'" *United States v. Lawson*, 810 F.3d 1032, 1043 (7th Cir. 2016) (citations omitted); *see also United States v. Porchay*, 651 F.3d 930, 942 (8th Cir. 2011) (noting that even if the prosecution delays disclosure of evidence, *Brady* is not violated if the evidence is nonetheless disclosed during trial); *United States v. Jeanpierre*, 636 F.3d 416, 422 (8th Cir. 2011) ("*Brady* does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial.").

Upon our de novo review, we do not find the denial of the motion for a continuance violated Seth's due process rights. For the same reasons, we find no abuse of discretion by the district court in denying both his motion to continue and motion for a mistrial. We therefore affirm on this issue.

### B. Sufficiency of the Evidence.

Seth also claims the evidence was insufficient to support his convictions. Our review of sufficiency claims is for correction of errors at law. *State v. Reed*, 875 N.W.2d 693, 704 (Iowa 2016).

> In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. [W]e will uphold a verdict if substantial record evidence supports it. We will consider all the evidence presented, not just the inculpatory evidence. Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence.

*Id.* "In assessing the sufficiency of the evidence, we find circumstantial evidence equally as probative as direct." *State v. Vaughan*, 859 N.W.2d 492, 497 (Iowa 2015) (citation omitted).

The case against Seth was largely circumstantial. The State offered evidence regarding Seth's on-going affair with McFarland and his stated desire to leave Lisa. Seth even told McFarland he had asked Lisa for a divorce and Lisa was going to pack her things and leave. However, Lisa never told any family or friends Seth wanted a divorce or she planned to leave Seth. Instead, she was shot and killed in the early morning on the day Seth told McFarland Lisa would be gone. Only two peoples' presence can be accounted for in the home at the time of the murder—Lisa's and Seth's. Seth was awake at the time of the shooting, though he did not see or hear anything other than the solitary gunshot that killed his wife while she reportedly lay in darkness. Although Seth claims he

froze and was unable to render Lisa aid after the shooting, he called 9-1-1, dressed, and waited outside for emergency responders to arrive. The gun that killed Lisa had been present in the home at the time of the shooting and was the only gun Seth did not account for when asked to provide a list of weapons in the home. It was later recovered on the property. Seth's statements he and Lisa were happy the night before the murder contradict the claims he made to McFarland about divorcing Lisa. He only changed his claim that Lisa was a perfect "ten" of happiness the night before when he was confronted with the knowledge that someone else knew of an argument the couple had engaged in that night—one which Seth then downplayed. This was one of many false or misleading statements Seth made to law enforcement and others concerning his relationship with Lisa, his relationship with McFarland, his involvement in the dispute with his neighbor, and—in all likelihood—the events leading up to the death of Lisa and her unborn child.

Although there is no direct proof that Seth murdered Lisa, we conclude the evidence—though circumstantial and subject to differing views by reasonable jurors—when viewed in the light most favorable to upholding the verdict, was sufficient to prove guilt beyond a reasonable doubt. We affirm on this issue.

### C. Ineffective-Assistance-of-Counsel Claims.

Seth also claims his trial counsel was ineffective because some questioning led to a witness commenting on Seth's truthfulness. Likewise, he argues counsel had a duty to object to statements made by the prosecutor in its closing rebuttal. We ordinarily preserve ineffective-assistance claims for postconviction-relief (PCR) proceedings to allow the record regarding counsel's

conduct to be fully developed. *See State v. Kirchner*, 600 N.W.2d 330, 335 (Iowa Ct. App. 1999). "Only in rare cases will the trial record alone be sufficient to resolve the claim." *State v. Atley*, 564 N.W.2d 817, 833 (Iowa 1997). We find the record sufficient to decide the ineffective-assistance-of-counsel issue.

### 1. *Eliciting Improper Testimony.*

Seth argues counsel elicited testimony from Agent Thomas at trial that caused the witness to comment on Seth's credibility. For instance, trial counsel asked Agent Thomas if Seth "lied throughout the entire interview," and Agent Tomas answered, "That's what I'm telling you." However, Seth did not challenge the admissibility of the video interview, wherein Seth himself admitted he was not truthful at times.

Opinion evidence is not allowed to directly comment on whether the defendant is guilty or innocent. *State v. Hulbert*, 481 N.W.2d 329, 332 (Iowa 1992). There is a "fine but essential line" between opinions conveying conclusions as to guilt or innocence and those might help a jury. *State v. Myers*, 382 N.W.2d 91, 98 (Iowa 1986). Opinion testimony suggests one party is being truthful while another dishonest, implying an opinion on guilt or innocence, crosses this line. *Id.* at 97-98.

Here, we agree with the State Agent Thomas's statements were non-testimonial in nature; an officer's stated opinion a defendant was not being truthful during an interview is not testimony offered to impeach the witness. *See State v. Enderle*, 745 N.W.2d 438, 442-43 (Iowa 2007). *Enderle* focused on the effect of the statement as an attack on credibility, *see id.*; however, we find the non-testimonial statements by Agent Thomas did not invade the jury's role and

express an opinion Seth was guilty, particularly in light of Seth's own admittance to lying during the interview. Because trial counsel has no duty to raise a meritless claim, Seth has failed to show his counsel was ineffective in this respect, and we accordingly affirm on this issue.

### 2. *Failure to Object During State's Closing Rebuttal*.

In his rebuttal on behalf of the State, the prosecutor stated, among other things:

> There have been a lot of accusations by the defense that . . . the police just sort of stumbled through the whole thing and . . . didn't do their job essentially.
> We know that the [DCI] was called. . . . Wapello County investigated this. Interviews were conducted.
> You hear a lot of this sort of "no evidence this happened or happened and things were never investigated." And that—the suggestion is just because someone didn't get up on the stand and say something, it didn't happen, and that's not true. All right?

Seth argues his counsel should have objected to the following: "The suggestion is just because someone didn't get up on the stand and say something, that it didn't happen, and that's not true. All right?" Seth argues he "did not invite the misconduct."

To prevail on a claim of prosecutorial misconduct, Seth must show both the misconduct and resulting prejudice. *See State v. Krogmann*, 804 N.W.2d 518, 526 (Iowa 2011). We must "consider: '(1) the severity and pervasiveness of misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; (5) the extent to which the defense invited the misconduct.'" *Id.* (citation omitted). Generally "a finding of prejudice results from [p]ersistent efforts to inject prejudicial matter before the jury," not

from an isolated incident of prosecutorial misconduct. *See id.* The strength of the State's evidence is the most significant factor. *See id.*

Even assuming without deciding the statement was misconduct, Seth has failed to establish the minimal statement by the prosecutor in response to the defense's closing statements about the sloppy police work resulted in prejudice.

### 3. Cumulative Error.

Having found each of the underlying claims to have no merit individually, we reject Seth's claim of cumulative error.

### IV. Conclusion.

For all these reasons, we affirm Seth Techel's convictions.

**AFFIRMED.**