# IN THE COURT OF APPEALS OF IOWA

No. 23-2086
Filed October 1, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**SAYVONNE LEALBERT-EUGENE JORDAN,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Howard County, Laura Parrish,

Judge.


        The defendant appeals his convictions for first-degree murder and abuse of

a corpse, raising issues involving a request to strike a juror for cause, use of a

supplemental questionnaire for potential jurors, a mid-trial motion to continue, and

the evidence supporting his convictions.  **AFFIRMED.**


        Martha J. Lucey, State Appellate Defender, and Bradley M. Bender

(argued), Assistant Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Aaron Rogers (argued), Assistant

Attorney General, for appellee.


        Heard at oral argument by Greer, P.J., and Badding and Chicchelly, JJ.

**GREER, Presiding Judge.**

A jury found Sayvonne Jordan guilty of first-degree murder and abuse of a corpse. Jordan appeals those convictions, arguing: (1) the district court should have allowed him to strike potential juror 14 for cause; (2) the district court abused its discretion in denying his request to use a written questionnaire about pretrial publicity and race as part of voir dire; (3) after the State shared previously obtained evidence from Jordan's phone mid-trial, the court should have granted his motion for mistrial or, alternatively, his motion for a four-day continuance; (4) there is not substantial evidence he is the person who killed Jonathan Esparza and dismembered and burned Esparza's body or, alternatively, that he had the requisite intent when committing the acts; and (5) the district court's ruling on the motion for new trial lacked any explicit weighing of the evidence or credible findings, preventing meaningful appellate review.

We find no merit in Jordan's claims and affirm his convictions.

**I. Background Facts and Proceedings.**

Sometime after last seeing him alive on October 20, 2022, Jonathan Esparza's friends and family reported him as a missing person to local law enforcement. Investigators learned that Esparza left his house on the evening of October 20 with reported plans to go see Jordan. When asked, Jordan denied being in the area that night, instead claiming he was in Des Moines after traveling from Texas for a family wedding. But later, law enforcement learned that Jordan's neighbors saw him having a large bonfire in his backyard; his neighbor's surveillance camera corroborated statements that a bonfire took place.

After law enforcement obtained a warrant to search Jordan's residence, they seized a burn barrel and fire remnants from his backyard. In the barrel, they found what appeared to be bone fragments. They also seized an ax from Jordan's residence.

The State charged Jordan with first-degree murder and abuse of a corpse. Jordan maintained his innocence and elected to be tried by a jury.

At the six-day trial in November 2023, the State introduced evidence that Esparza went into Jordan's home in the early morning hours of October 12, 2022, and stole several pounds of methamphetamine (likely worth $20,000 or more). Because Esparza sent Jordan a message before he went to his home and due to at least one surveillance camera at his residence, Jordan was aware that Esparza was the person who stole the drugs. And Jordan was angry. Later that same morning, Jordan went to Esparza's home and confronted him; Jordan said that he needed that "shit" back and that somebody was going to die for this. It was with this backdrop that Esparza left his house on October 20—reportedly going to Jordan's residence to see him—and was never seen by his friends and family again.

Dr. Heather Garvin, a board-certified forensic anthropologist with a Ph.D. in functional anatomy and evolution, testified for the State. She explained she consulted for the Office of the State Medical Examiner and performed a forensic anthropological analysis on the recovered bone fragments, which she confirmed were human remains. Approximately 1100 bone fragments were recovered. After comparing the recovered frontal sinus ("the fingerprint of the skull") with a CT scan Esparza underwent in 2018 and Esparza's medical history involving surgical repair

of an ACL with a recovered bone fragment, plus other factors suggesting the height and sex of the person whose remains were recovered, Dr. Garvin opined with a reasonable degree of scientific certainty that the remains were those of Esparza.[1] Mike Halverson, who works in the DNA section of the Iowa Division of Criminal Investigation Crime Lab, testified about the DNA analysis completed on the head of the ax that was seized from Jordan's home. Because the lab did not have a known sample of DNA from Esparza, it received samples from Esparza's biological parents. Halverson reported "it's very likely, 99.9999 percent" that the person whose DNA was found on the ax head "is related to or an offspring off" Esparza's mother and father.

After the State completed its case in chief, the defense rested without presenting any evidence.

The jury found Jordan guilty of both charges. He was later sentenced to life in prison without the possibility of parole and a ten-year indeterminate term, to be served consecutively. Jordan appeals.

## II. Discussion.

### A. Written Questionnaire.

About a week before trial, Jordan asked for permission to use a written supplemental questionnaire with potential jurors regarding pretrial publicity surrounding the case and possible racial biases. Jordan asserted the

---

[1] At trial, Dr. Garvin clarified that while she held that opinion, she did not personally make the final identification—her role as consultant for the Office of the State Medical Examiner was to compile a report and submit it; a doctor with the state medical examiner's office actually signed the death certificate and made the final determination.

questionnaire would "help to get the conversation about race going as well as weed out potential jurors with biases who may not have been willing to come forward in front of the entire group of potential jurors." The State resisted, arguing "there is no rule requiring written questions" and "a questionnaire would not achieve any greater good than simply asking the panel." The district court denied Jordan's request without a hearing; it ruled:

> The questions that [Jordan] seeks to ask in a written questionnaire can be handled during voir dire without prejudice to [him]. The Court will advise the jury panel that individual voir dire can be conducted, outside the presence of the entire panel, if any potential juror feels more comfortable providing their responses in private. The Court is confident that counsel can frame their voir dire questions in such a manner as to invite open, honest responses, or to suggest that individual voir dire can occur if appropriate. The use of a separate written questionnaire would unnecessarily complicate and lengthen the jury selection process.

On appeal, Jordan challenges the district court's denial of his request. "We review claims of voir dire error for an abuse of discretion." *State v. Williams*, 929 N.W.2d 621, 628 (Iowa 2019). "When assessing a district court's decision for abuse of discretion, we only reverse if the district court's decision rested on grounds or reasoning that were clearly untenable or clearly unreasonable." *Id.* at 629 (citation omitted).

Without any authority behind the argument, Jordan maintains the district court abused its discretion by preventing him from using the written questionnaire because of the importance of voir dire, the wide latitude given to counsel in conducting questioning during the process, and the valid concerns about potential prejudice due to pretrial publicity and racial biases. But as the State points out, the district court did not limit the scope of Jordan's voir dire—it just required him to

ask the questions orally rather than in writing. And while we appreciate his argument that there was a possibility potential jurors would give different answers to questions about race in a private, written response than they would in front of a group, the district court alleviated this concern by informing the potential jurors that it would allow "individual interview[s]" if "there are any issues that you are uncomfortable sharing in front of the group as a whole." And the court followed through—several potential jurors were questioned separately.

Here, Jordan was allowed unrestricted oral questioning of prospective jurors, both in a group and individually. We cannot say the district court's ruling limiting just the form of questioning—that it take place orally rather than in writing— constitutes an abuse of discretion.[2] *Cf. Williams*, 929 N.W.2d at 631 (collecting cases rejecting defendant's claimed entitlement to individual questioning during voir dire to explore racial prejudice).

**B. Motion to Strike Juror 14 for Cause.**

During voir dire, the following exchange took place between defense counsel and potential juror 14:

> DEFENSE COUNSEL: [W]hat do you think? Do you think that the defense needs to prove something to you when you consider this case?
> JUROR 14: I think either side needs to prove whether the facts that were brought by the other side, they have a right to refute

---

[2] In passing, Jordan claims the district court's denial of his request to use a supplemental questionnaire constituted a structural error, which entitles him to a new trial. *See Thongvanh v. State*, 938 N.W.2d 2, 13 (Iowa 2020) ("Structural errors are those affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. Such errors infect the entire trial process, and necessarily render a trial fundamentally unfair. . . . When there is structural error, the criminal adversary process itself becomes presumptively unreliable." (cleaned up)). But because the district court was not wrong to deny his request, there can be no structural error.

those facts; and we need to know without a reasonable doubt that those—what statement's being made is true.

DEFENSE COUNSEL: Okay. So tell me, though, when it comes to you deliberating the case and you're thinking about all the things the defense did and all the things that the State did, if you have a question about some piece of evidence, who's to blame for not putting it before you? Is it the State or the defense?

JUROR 14: That's a good question.

DEFENSE COUNSEL: Okay. Do you follow or are you with me, though, that you're going to get instructions that—I get it. I have a job. I'm not going to be playing cards during this trial, but we don't have to prove things to you. The State has to prove it; all right? So at the end, the question is only did the State prove it beyond a reasonable doubt.

JUROR 14: I still go back to the fact that, if they bring up—something forward and the defense can't come back to me and tell me something different, then that's up to—to me, that's up to the defense to prove that they're wrong;—

DEFENSE COUNSEL: Okay.

JUROR 14:—and if they did not do that—

DEFENSE COUNSEL: So in [a previous hypothetical], all right, with the—with the bank robbery, if the State were to bring a witness that said I saw [John Doe] and [John Doe] then doesn't have his own witness to say you're wrong, you would find [John Doe] guilty?

JUROR 14: There's more to it than that.

DEFENSE COUNSEL: Okay. I'm just trying to follow where you're going because here—I mean, the State's going to have a whole bunch of witnesses. What if the defense calls none?

JUROR 14: Like I said, I'd hope that the defense would have some things to offset what the State is bringing forward.

DEFENSE COUNSEL: And if they don't?

JUROR 14: How can I judge?

DEFENSE COUNSEL: Well, that's what I'm asking. Because at the end, the instruction is going to say that you are supposed to consider the evidence produced by the State, or lack thereof, to decide this case. It doesn't say anything about consider the evidence produced by the defense. So are you going to—no—And it's fine if this is your answer. I'm just trying to figure out where you're at here. Are you saying that you are going to hold the—the defense to some sort of standard of having to prove you something?

JUROR 14: I think so. My opinion.

DEFENSE COUNSEL: Okay. Is that something I'm going to be able to change your mind on in the next week?

JUROR 14: We'll find out.

DEFENSE COUNSEL: I don't want to wait to find out, sir.

JUROR 14: That's my belief right now.

> DEFENSE COUNSEL: Okay.
> JUROR 14: That's the way I've always been.

Without specifying a cause under Iowa Rule of Criminal Procedure 2.18(5), defense counsel moved to strike potential juror 14. Before ruling on Jordan's request, the court spoke with potential juror 14:

> THE COURT: [Juror 14], if you are specifically instructed by myself regarding the law—
> JUROR 14: Ah-huh.
> THE COURT:—that the defendant does not have to prove his innocence, that the burden is entirely on the State,—
> JUROR 14: Ah-huh.
> THE COURT:—would you be able to follow that instruction?
> JUROR 14: Yes, ma'am.
> THE COURT: He will stay, at least for now.
> DEFENSE COUNSEL: [Juror 14],—
> JUROR 14: I heard it from the judge.
> DEFENSE: Okay. All right. Are you going to follow through with what you said to the judge?
> JUROR 14: Yes, ma'am.

Jordan later used a peremptory strike on juror 14, requested an additional strike from the court, and named the other juror he would have struck. Jordan and the State agree that Jordan followed the procedure outlined in *Jonas*—and now Iowa Rule of Criminal Procedure 2.18(11)—so if the court abused its discretion in denying Jordan's motion to strike for cause, then prejudice is presumed and he is entitled to a new trial. *See State v. Jonas*, 904 N.W.2d 566, 583 (Iowa 2017) ("Specifically, in order to show prejudice when the district court improperly refuses to disqualify a potential juror . . . and thereby causes a defendant to expend a peremptory challenge under [Iowa Rule of Criminal Procedure 2.18(10) (2023)], the defendant must specifically ask the court for an additional strike of a particular juror after his peremptory challenges have been exhausted. Where the defendant makes such a showing, prejudice will then be presumed." (footnote omitted)); *State*

*v. Linderman*, 958 N.W.2d 211, 218 (Iowa Ct. App. 2021) ("We review the district court's rulings on challenges to potential jurors for cause for abuse of discretion. The district court is vested with broad discretion in such rulings." (citations omitted)).

On appeal, Jordan argues the district court should have granted his motion to strike for cause because the potential juror's statements showed he "formed or expressed such an opinion as to the guilt or innocence of the defendant as would prevent the juror from rendering a true verdict upon the evidence submitted on the trial." Iowa R. Crim. P. 2.18(5)(k). While Jordan argues juror 14's statements suggest he "would be at an unfair disadvantage" if juror 14 was allowed to serve on the jury, we note that juror 14 did not express a fixed opinion on the merits of the case. And when "determining whether a challenge for cause [under rule 2.18(5)(k)] should be granted, the test is 'whether the juror holds such a fixed opinion of the merits of the case that he or she cannot judge impartially the guilt or innocence of the defendant.'" *Linderman*, 958 N.W.2d at 218 (citation omitted). The issue Jordan has with juror 14's statements does not fit within the for-cause reason that Jordan claims supports his motion to strike. And we refuse to expand the scope of rule 2.18(5)(k).

Relatedly, Jordan also complains that the district court "rehabilitated" juror 14 in violation of rule 2.18(6), which allows the court to "clarify the juror's position but . . . not attempt to rehabilitate the juror by its own questioning." *Jonas*, 904 N.W.2d at 575 ("[W]e do not believe the district court can rehabilitate the potential juror through persistent questioning regarding whether the juror would follow instructions from the court."). We do not find the above exchange to be "persistent"

questioning and we give the trial court wide discretion in ruling on challenges for cause as it has a firsthand view of the panelist's demeanor when answering the questions posed. *Id.* at 574, 586 (Waterman, J., concurring) (noting the "trial judge's estimation of a juror's impartiality" is influenced by "the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty" (citation omitted)). Once the court explained what the law required of him, juror 14 did not express any reservations in following that directive.

We find no issue with the district court's denial of Jordan's motion to strike juror 14 for cause.

### C. Evidence from Jordan's Phone.

Between the first and second day of trial (after the jury was sworn in but before the presentation of evidence began), the State alerted Jordan that it recently gained access to his cell phone.[3] The prosecutors provided Jordan's attorneys a copy of the text messages sent between Jordan and Esparza but were unable to hand over all of the information on Jordan's phone (i.e. the "phone dump") until they received a hard drive on which to put the information. At the time Jordan's attorneys brought the issue to the court's attention on the second day of trial (Thursday morning), they were not yet in possession of the rest of the cell phone information. Jordan asked the court "for a mistrial because of this late disclosure. I think it was intentional. I think the State withheld it on purpose until after the jury was selected in this case." Alternatively, he requested a continuance until Monday morning (four days).

---

[3] The police had seized Jordan's cell phone much earlier, but they were previously unable to get past the password screen to access its contents.

The prosecutor resisted the motion for mistrial, arguing that the State did not intentionally withhold anything. He noted that the State was unaware what was on the device and had been trying to access the contents for a long time; the State and Jordan both would have had access earlier if Jordan had complied when they attempted to use facial recognition to get past the password screen. The prosecutor continued:

> So the claim that they've got something exculpatory on there that they've just been waiting for us to get to, they could have broken that a long time ago. So the prejudice of being able to break this isn't on them, it's on us. We got—We got access to this phone, and we believe there is incriminating stuff on it; however, since we've already started the trial, the State can't use it.

Additionally, the prosecutor stated the "first time [he] laid eyes on the contents of the phone[] was yesterday."

> Jordan responded:

> I was waiting for [the prosecutor] to say they cracked it yesterday because they provided me an extraction report and the metadata in the extraction report, which I can produce for this Court, says that report was generated on October 27th, last Friday. So they have had it. They didn't give it to us until this trial started.
>     It is detrimental to us if we are forced to proceed. I need to see what's on it so I can be able to cross-examine any witness that the State calls.

Before concluding "that mistrial is not the appropriate remedy," the court stated, "Certainly, if this information was available last Friday, it should have been produced last Friday. It would have avoided this significant interruption to the course of this trial." The court noted it was about an hour after the parties arrived for the second day of trial and questioned why the defendant was still without access to the phone dump. Then the court went off the record so the State could determine what needed to be done to give Jordan access to the phone information.

When the court came back on the record a little after 9:00 a.m., the court relayed that it expected Jordan to be given the phone information "immediately" and that it would tell the jury the presentation of evidence would not begin until 1:00 p.m.— giving Jordan about four hours to review the new information.

Less than an hour later, the parties and court went back on the record. Defense counsel reported receiving the phone information about fifteen minutes earlier and, upon opening it up, learned "[i]t's 32 gigabits of information. There are in here 15,000 emails, 21,000 webs searches, 575 instant messages, 1,056 chats." And the police officer they wished to contact to ask about the phone extraction was out of town for a funeral. Defense counsel reported they could not be ready by 1:00 p.m. After another recess to attempt to reach the police officer who completed the extraction of information from Jordan's phone, the parties went back on the record with the court. Defense counsel stated:

> So my understanding is that the State hasn't been able to reach [the police officer] either. I do think the funeral is actually today so that's probably what he's doing. I—I continue to have questions I want to ask [him]. . . .
> There's some stuff on the phone that I do want to follow up on, and I do still want the answers from [the officer]. I've seen what— probably most of what I needed to see. My co-counsel hasn't seen it. We haven't gone over it with [Jordan] at this time.
> I've—I'm offering a compromise here. I'm asking to start tomorrow morning so I can try to get some of these things buttoned up. . . . I'm an efficient person. I can move fast. It's just I need to process what I've gone through, figure out what to do, how to handle it; and I—I just—I'm hesitant to rush into witnesses at 1:00 this afternoon.

After the State resisted, Jordan's attorney reiterated that the State had the information for nearly a week before providing it to them. The court ruled:

> Balancing the possible prejudice to the defendant in not being able to have sufficient opportunity to review and consider this

information with his counsel against the difficulties imposed on the State with regard to availability and organization of witnesses, I do find that it is appropriate to wait to commence evidence until tomorrow morning at 9:00.

Absent some extraordinary, unanticipated, never-could-have-guessed new information in the morning, it is a firm expectation that we will start at nine.

No other continuance was requested or given, and the State began its presentation of evidence the next morning. Jordan did not make any record related to his ability to review the documents following the extra time he was given.

On appeal, Jordan challenges the district court's denial of his motion for mistrial and, in the alternative, the denial of his request for a four-day continuance. The State contests error preservation, arguing that defense counsel's offer of a "compromise" to continue the trial for one day—until the next morning—constituted a surrender of its original request for a mistrial or longer continuance. It also argues Jordan's claims lose on the merits.

We begin with error preservation. "The doctrine of error preservation has two components—a substantive component and a timeliness component." *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011). This means a defendant must "alert the district court to his specific objections" and "do so in a timely manner." *Id.* And of course, "[b]ecause we are [an] error-correction court[], we generally don't decide issues for the first time. Rather, we usually decide only those issues that were (1) properly raised in the district court and (2) ruled on by the district court." *State v. Chawech*, 15 N.W.3d 78, 83 (Iowa 2024).

Here, Jordan brought the issue to the district court as soon as he was able—once the parties went on the record for the second day of trial. He moved for mistrial or, in the alternative, a four-day continuance and explained why he

believed the relief was necessary. The district court immediately rejected his request for a mistrial, concluding "that mistrial is not the appropriate remedy." The request for the four-day continuance was still on the table while the court took a recess for the parties to determine how soon Jordan could get the information from the phone dump. When the court went back on the record, it announced Jordan would receive the information immediately and it would continue trial until 1:00 p.m. (about four hours), an implicit rejection of Jordan's request for a four-day continuance. It was only after the court denied both of Jordan's requests that the parties went back on the record another time and Jordan asked for more time than the court gave in its previous ruling—"offering a compromise" to continue the trial until Friday morning rather than beginning Thursday afternoon at 1:00 p.m. The State resisted the additional delay, but the district court granted the request to continue until Friday.

While defense counsel's phrasing suggested Jordan was willing to give something up in exchange for a later start time, that is not actually what took place. *Cf. Compromise*, Merriam-Webster, https://perma.cc/3AN4-YPQH (last visited June 3, 2025) (defining the verb compromise to mean "to come to agreement by mutual concession"). Jordan had already been denied his previous requests—he had no outstanding claims to give up. Despite his word choice to the contrary, Jordan was asking the court to extend the continuance beyond the four hours previously given. So, while the State suggests Jordan abandoned his previously-raised claims when he "offer[ed] a compromise," we conclude Jordan preserved error on both his request for mistrial and four-day continuance.

**Motion for Mistrial.** Jordan argues the district court should have granted his motion for mistrial because the State's delayed disclosure of the phone information "was in bad faith, as the State possessed the information for at least five days before providing it to the defense." And, he maintains, the fact that he was allowed less than twenty-four hours to review the voluminous information jeopardized his ability to present a defense.

We review the district court's denial of Jordan's motion for mistrial for an abuse of discretion. *See State v. Brown*, 996 N.W.2d 691, 696 (Iowa 2023). "The defendant is only entitled to a new trial if the prejudice resulting from the denial prevented the defendant from having a fair trial." *Id.* Similarly, "[a] mistrial is appropriate when . . . the verdict 'would have to be reversed on appeal due to an obvious procedural error in the trial.'" *State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006) (citation omitted).

As in *State v. Piper*, the State's delay in providing Jordan with the information from the phone dump—whether intentional or not—"hampered the defense attorneys' preparation efforts." 663 N.W.2d 894, 902 (Iowa 2003), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 550–51 (Iowa 2010). But there was no record developed below, during or after trial, and no suggestion on appeal detailing what of the late-provided information was critical to the defense of the case. "None of the items at issue exonerated the defendant or even cast doubt on his guilt. Nor does the defendant claim he would have changed his defense strategy had he known of the evidence earlier." *Id.* at 903. Jordan argues broadly that having the evidence sooner *could have* impacted his defense strategy, he does not point to any specific piece of evidence that would have

changed his defense or enunciate any other reasonable strategy that could have been pursued with the evidence in hand.

Jordan also attempts to link the denial of his request for a mistrial to his constitutional right to present a defense. As we understand it, Jordan is claiming his motion for mistrial should have been granted because the State violated his right to present a defense with the late delivery of the phone information.

Our supreme court discussed the constitutional right to present a defense in *State v. Clark*, 814 N.W.2d 551, 560–61 (Iowa 2012), stating:

> The right to present a defense stems from the Sixth Amendment right to a fair trial. However, this court, as well as the United States Supreme Court, has simply relied on the Due Process Clause alone when deciding issues in this area.
> The right to present a defense is so fundamental and essential to a fair trial that it is accorded the status of an incorporated right through the Fourteenth Amendment's Due Process Clause. We have explained the right to present a defense as follows:
> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

(cleaned up).

Jordan's claim the late phone information deprived him of the right to present a defense is not on point—he reads the right too broadly. "A criminal defendant has no due process right to pretrial discovery." *Id.* at 561. And "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995). The United States Supreme Court has "never held that

the Constitution demands an open file policy." *Id.* at 437. Jordan has not established that the State violated a constitutional right with the late delivery of the phone information.

Because "[w]e see no 'obvious procedural error' that would have required reversal on appeal" and cannot conclude on this record Jordan was prevented from having a fair trial, we affirm the district court's denial of Jordan's motion for mistrial. *Piper*, 663 N.W.2d at 903. However, by this ruling we do not condone the late notice and disclosure of the information as we would hope the State would disclose the evidence as soon as possible.

**Motion for Four-Day Continuance.** Jordan also challenges the district court's decision to grant him only a one-day continuance rather than the four days he initially requested.[4] "[I]n granting or denying continuances the trial court's discretion is 'very broad.'" *State v. Grimme*, 338 N.W.2d 142, 144 (Iowa 1983) (citation omitted). "A trial court's ruling on a motion for continuance 'will not be interfered with on appeal unless it clearly appears that the trial court has abused its discretion, and an injustice has resulted therefrom.'" *Id.* (citation omitted).

As we already concluded, Jordan did not waive or abandon his request for a four-day continuance by asking the district court to resume the trial Friday morning rather than Thursday afternoon. And we find the facts surrounding Jordan's limited request compelling when deciding whether injustice occurred. After his four-day request was rebuffed, Jordan's counsel told the court that the

---

[4] As already explained, the court initially granted a four-hour continuance when Jordan asked for four days. Later the court reconvened on the record and, following an additional request from Jordan, agreed to continue the trial until the next morning—ultimately continuing the trial for a total of about one day.

defense could complete their review of the new evidence if given until Friday morning. And then Jordan reported for trial Friday morning without raising any issues about completing the review or making a request for another continuance.[5] So, while Jordan did not get the four days he initially requested, on this record, it seems that the one-day continuance he was given was enough to enable the necessary review of the phone information. The district court did not abuse its discretion in giving him a shorter continuance than he initially requested.

### D. Sufficiency of the Evidence.

Jordan challenges the sufficiency of the evidence supporting his convictions for first-degree murder and abuse of a corpse. The State has the burden to prove every element of the offenses for which the defendant is charged. *See State v. Armstrong*, 787 N.W.2d 472, 475 (Iowa Ct. App. 2010). And unchallenged jury instructions "become the law of the case for purposes of appellate review for sufficiency-of-evidence claims." *State v. Schiebout*, 944 N.W.2d 666, 671 (Iowa 2020). So here, to establish Jordan committed first-degree murder, the State had to prove:

> 1. On or about the 20th day of October, 2022, [Jordan] harmed Jonathan Esparza.
> 2. Jonathan Esparza died as a result of being harmed.
> 3. [Jordan] acted with malice aforethought.
> 4. [Jordan] acted willfully, deliberately, premeditatedly and with a specific intent to kill Jonathan Esparza.

And, to establish abuse of a corpse, the State had to prove:

> 1. On or about the 20th day of October, 2022, [Jordan] mutilated, disfigured, or dismembered the corpse of Jonathan Esparza; or [Jordan] hid or buried the corpse of Jonathan Esparza.

---

[5] We recognize the court expressed that the Friday start time should be understood as "a firm expectation."

2. [Jordan] specifically intended to conceal a crime.

On appeal, Jordan argues the State failed to prove he was the person who committed the criminal acts or, in the alternative, that he committed the acts with the necessary intent. *State v. Jensen*, 216 N.W.2d 369, 374 (Iowa 1974) ("Identity is an element of a criminal offense which the State must prove beyond a reasonable doubt."); *State v. Johnson*, 534 N.W.2d 118, 126 (Iowa Ct. App. 1995) ("Generally criminal intent is an essential element of an offense.).

"We review sufficiency of the evidence claims for correction of errors at law."[6] *Crawford*, 974 N.W.2d at 516. "When evaluating the sufficiency of the evidence, we consider 'whether, taken in the light most favorable to the State, the finding of guilt is supported by substantial evidence in the record.'" *Id.* (citation omitted). "There is substantial evidence if the evidence 'would convince a rational fact finder the defendant is guilty beyond a reasonable doubt.'" *Id.* (citation omitted). "We draw all legitimate inferences in support of the verdict." *Id.* "However, evidence which merely raises suspicion, speculation, or conjecture is insufficient." *Id.* (cleaned up). For us to affirm "[t]he evidence must at least raise a fair inference of guilt as to each essential element of the crime." *Id.* at 516–17.

**Identity.** Jordan acknowledges the abundance of evidence that establishes he had a motive to kill Esparza; that Esparza is, in fact, dead; and that Esparza's

---

[6] In passing, Jordan argues we should review his sufficiency-of-the-evidence claim de novo because the Due Process Clause is implicated. *See State v. Crawford*, 972 N.W.2d 189, 199 (Iowa 2022) ("[T]he Constitution 'protects an accused against conviction except upon evidence that is sufficient fairly to support a conclusion that every element of the crime has been established beyond a reasonable doubt.'" (citation omitted)). We do not have the authority to overrule supreme court precedent. *See State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014). We do not consider this argument further.

remains were found dismembered and burned at Jordan's residence. But he argues his opportunity and motive to commit the killing, along with his presence at the crime scene, is not substantial evidence he was the person who committed the killing and dismembering. We disagree. "Whether the State's evidence is direct, circumstantial, or some combination of the two, the State is not required to negate any and all rational hypotheses of the defendant's innocence." *State v. Jones*, 967 N.W.2d 336, 342 (Iowa 2021).

Here, the State introduced undisputed evidence Esparza stole a large amount of valuable drugs from Jordan about a week before he went missing. Jordan was aware Esparza stole the drugs, and he threatened violence if he did not get them back. When Esparza left his home on October 20—the last time he was seen by friends and family—he was intending to go to Jordan's residence to see Jordan. Law enforcement first spoke with Jordan a few weeks later, while Esparza was still considered a missing person, and Jordan minimized the extent of his relationship with Esparza and lied about being out of town on October 20— he claimed he was still making his way back from a family wedding in Texas. But he was in town; Jordan had a document notarized at a local courthouse that day, and his neighbors saw him having a bonfire in his yard that night. *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993) ("A false story told by a defendant to explain or deny a material fact against him is by itself an indication of guilt and the false story is relevant to show that the defendant fabricated evidence to aid his defense."); *State v. Bloom*, 983 N.W.2d 44, 50 (Iowa 2022) ("A defendant's own admissions are evidence, and these 'may be implied by the conduct of the defendant subsequent to a crime, including fabrication, when such conduct

indicates a consciousness of guilt.'" (citation omitted)). Police later seized fire remnants from Jordan's backyard where they found 1100 human bone fragments. Within a reasonable degree of scientific certainty, those bone fragments were the remains of Esparza. And later, an ax that had the DNA of a person related to Esparza's biological parents was seized from Jordan's home.

It is not clear how Esparza was killed—whether he was shot, stabbed, or something else. But the State only had to prove Jordan "harmed" Esparza and that "Esparza died as a result of being harmed." Based on the evidence the State introduced at trial, a rational jury could conclude it was Jordan who harmed Esparza, which caused his death, and then, to cover up his crime, dismembered and burned Esparza's remains.

**Requisite Intent.** Jordan also challenges the evidence supporting the determination he killed Esparza with malice aforethought and that he acted willfully, deliberately, premeditatedly and with a specific intent to kill Jonathan Esparza.[7] The State's witnesses conceded that the condition of Esparza's remains—only bones, broken into approximately 1100 pieces, and burned—made it impossible to determine what caused Esparza's death. Law enforcement noted what appeared to be two bullet holes in Jordan's basement and found corresponding shells and bullets, but it was not clear if that evidence was tied to Esparza's death. This is not a case where we can rely on the violent nature of a

---

[7] Jordan's briefing suggests he's also challenging the intent-element for his abuse-of-a-corpse conviction; he argues, "If this Court determines that there is sufficient evidence to prove that Jordan was the person who caused Esparza's death and dismembered his body, Jordan alternatively argues that the evidence was insufficient to prove he had the requisite intent necessary for the charges." But he does not actually make any arguments that apply to that charge.

decedent's death to determine there was premeditation and malice aforethought. *Cf. State v. Blair*, 347 N.W.2d 416, 421 (Iowa 1984). But deliberation and premeditation can also be shown by circumstantial evidence of "planning activity of the defendant which was directed toward the killing" or "motive which might be inferred from entire relationships between defendant and victim." *State v. Origer*, 418 N.W.2d 368, 370 (Iowa Ct. App. 1987). Here, Jordan had the motive to kill Esparza because of the stolen drugs, and text messages sent between Jordan and Esparza show that Jordan was taking steps to commit violence against whoever took the drugs if they were not returned to him.

Jordan suggests there is not sufficient evidence he acted with malice aforethought because of the lack of evidence surrounding how exactly Esparza was killed or even where the killing took place.[8] He argues, "We don't know if Jordan's expressed [intent] to harm Esparza coincided with a premediated act. Perhaps Jordan took Esparza's life in a 'spur-of-the-moment act' or 'because he panicked' or acted in 'the anger of the moment.'" But there is no evidence in the record to support Jordan's theories. Rather, the evidence that was actually

---

[8] The jury was instructed as follows:

"Malice" is a state of mind which leads one to intentionally do a wrongful act to the injury of another out of actual hatred, or with an evil or unlawful purpose. It may be established by evidence of actual hatred, or by proof of a deliberate or fixed intent to do injury. It may be found from the acts and conduct of the defendant, and the means used in doing the wrongful and injurious act. Malice requires only such deliberation that would make a person appreciate and understand the nature of the act and its consequences, as distinguished from an act done in the heat of passion.

"Malice aforethought" is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time.

presented established that Jordan was aware Esparza had stolen a large quantity of valuable drugs from him and that Jordan had threatened violence in retribution if the drugs were not returned to him. The jury was allowed to infer that Jordan followed through with his threats, intentionally harming and killing Esparza when the methamphetamine was not returned to him.

Substantial evidence supports each of Jordan's convictions.

**E. Motion for New Trial.**

Finally, Jordan challenges the district court's ruling on his motion for new trial based on his claim the jury's verdict was contrary to the weight of the credible evidence. *See* Iowa R. Crim. P. 2.24(2)(b)(7). Here, Jordan filed a written motion before providing a lengthy argument before sentencing. The State resisted, and the district court ruled orally, stating only:

> I have considered the arguments of both of the parties regarding the motion for new trial, and I do believe that the greater amount of the credible evidence does, in fact, support the jury's verdict of guilty on both counts. And therefore, the jury's verdict will stand, and the defendant's motion is overruled.

On appeal, Jordan argues the district court's "brief generic [statements] are not sufficient to permit meaningful appellate review." He asks us to conclude the court's failure to make explicit credibility findings and weigh any specific evidence was an abuse of discretion and to remand to the district court to reconsider the motion and make adequate findings.

The State responds that there is no rule or authority Jordan can point to that requires the court to give a more in-depth ruling to his motion for new trial. And, in fact, we think *State v. Maxwell*, 743 N.W.2d 185, 192–93 (Iowa 2008), is incompatible with Jordan's request. In *Maxwell*, the defendant claimed "the district

court erred by failing to state its reasons for denying his motion for new trial and created a situation where this court is left with nothing to review." 743 N.W.2d at 192. While our supreme court reiterated that trial courts should state reasons on the record for the ruling, it ultimately concluded it was "oblig[ated] to affirm an appeal where any proper basis appears for a trial court's ruling, even though it is not the one upon which the court based its holding." *Id.* (citation omitted). And because the defendant's "motion raised the issue in the district court," the supreme court concluded it was "allowed to review the record to determine whether a proper basis exists to affirm the district court's denial of [the defendant's] motion for new trial." *Id.* at 193. The court then performed its own review of the record to determine whether the greater weight of the evidence supported the jury's verdict. *See id.* at 193–94. After confirming "[t]he jury's determination of guilt was not contrary to the weight of the evidence," the supreme court affirmed the district court's denial of the defendant's motion for new trial. *Id.* at 195.

*Maxwell* forecloses the remedy Jordan seeks. And Jordan does not challenge the substance of the district court's denial of his motion for new trial, so we do not perform our own review of the weight of the evidence in this case. We affirm the district court's denial of Jordan's motion for new trial.

**III. Conclusion.**

In sum, the district court's denial of Jordan's request to use a written supplemental questionnaire as part of voir dire was not an abuse of discretion. Juror 14 did not express a fixed opinion on the merits of the case and the district court did not engage in persistent rehabilitation, thus we find no issue with the district court's denial of Jordan's motion to strike juror 14 for cause. While Jordan

preserved error on his motion for mistrial and his request for a four-day continuance after the State shared evidence obtained from his cell phone mid-trial, the district court did not abuse its discretion in denying the motion for mistrial or granting only a one-day continuance. And substantial evidence supports each of Jordan's convictions. Finally, we will not remand to the district court for additional statements on the record regarding the denial of Jordan's motion for new trial. We affirm.

**AFFIRMED.**